Sharon **ANDERSON,** et al., Plaintiffs,

v.

Mario **CORNEJO,** individually and in his official capacity, et al., Defendants.

Barbara Arnold, et al., Plaintiffs,

v.

**United States of America,**
**et al., Defendants.**

Nos. 97 C 7556, 99 C 3786.

United States District Court,
N.D. Illinois,
Eastern Division.

March 10, 2000.

Memorandum Opinion and Order on
Reconsideration Oct. 12, 2000.

230

Judson H. Miner, Miner, Barnhill & Galland, Alan J. Shefler, Shefler & Berger, Ltd., Clyde E. Murphy, Cynthia A. Wilson, Chicago Lawyers' Committee for Civil Rights, Edward M. Fox, Ed Fox & Associates, Chicago, IL, Derrick A. Carter, Valparaiso University Law School Faculty, Valparaiso, IN, for plaintiffs.

James M. Kuhn, Assistant United States Attorney, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Two related cases have been assigned to this bench. The *Anderson* case (97 C 7556) contains claims by 47 African–American women that they were improperly searched when going through customs at O'Hare International Airport in Chicago, Illinois. The Sixth Amended Complaint in *Anderson* specifically names 59 employees of the United States Customs Service as defendants. The *Arnold* case (99 C 3786) contains similar claims[1] by 38 African–American women, none of whom are named plaintiffs in *Anderson*. The Second Amended Complaint in *Arnold* specifically names 54 employees of the Customs Service as defendants, many of whom are also named as defendants in *Anderson*.

Both pending complaints contain identically labeled counts. The counts can be divided into three categories, non-class claims based directly on conduct of nonsupervisory Customs inspectors (Counts I, III, V, and VI); class claims on behalf of a class of African–American women searched at O'Hare Airport and against supervisory Customs employees (Counts II, IV, VII, IX, and X); and a class claim for injunctive relief on behalf of a national class of air passengers (Count VIII).

Counts I, III, V, and VI are damages claims on behalf of the named plaintiffs only. Count I is an equal protection claim that Customs inspectors targeted African–American women for nonroutine personal searches. Count III is a Fourth Amendment claim that Customs inspectors lacked sufficient cause to seize, detain, and search plaintiffs. It includes claims by two plaintiffs that the gynecological examinations that they were required to undergo also constituted excessive force. Count V is a Federal Tort Claims Act ("FTCA") claim against the United States claiming that the conduct of the individual

---

1. The allegations are essentially identical except as to the persons involved and the dates of the allegations.

defendants constitutes false imprisonment, assault, and battery. Count VI is a Fourth and Fifth Amendment claim that Customs inspectors denied due process by not obtaining judicial authorization for the searches and by holding plaintiffs *"in communicado."*

Counts II, IV, VII, IX, and X are claims for damages made on behalf of a putative class of African–American women who were subjected to nonroutine personal searches at O'Hare. Count II is an equal protection claim that supervisory Customs employees failed to take proper action to prevent or stop the discriminatory selection of African–American women for nonroutine personal searches that is alleged in Count I. Count IV is a Fourth Amendment claim that supervisory Customs employees failed to take proper action to prevent or stop the illegal seizures, searches, and detentions alleged in Count III. Count VII is a Fourth and Fifth Amendment due process claim that supervisory Customs employees promulgated and executed a "policy and practice allowing the Customs inspectors, on nothing more than alleged 'reasonable suspicion,' (a) to detain plaintiffs for an indefinite and wholly discretionary time-period (b) to conduct the nonroutine personal searches described herein without judicial authorization, (c) while holding the plaintiffs *in communicado."* Count IX is a claim that supervisory Customs' employees conspired together in violation of 42 U.S.C. § 1985(3) to commit the violations alleged in Counts I, III, and VI, including by establishing criteria for targeting persons to be searched, fabricating search justifications, destroying plaintiffs' Customs declaration cards, and ignoring complaints of discrimination against African–American women. Count X is a claim that supervisory Customs employees violated 42 U.S.C. § 1986 by failing to prevent the conspiratorial conduct alleged in Count IX.

Count VIII is a claim for injunctive relief on behalf of a putative class of all persons in the country subjected to nonroutine personal searches at international airports. It is labeled as an Administrative Procedure Act ("APA") due process claim based on certain supervisory Customs officials' promulgation of the policy and practice alleged in Count VII.

■ Presently pending are plaintiffs' motions for class certification in both cases; defendants' motions to dismiss certain counts in both cases; defendants' motion for summary judgment as to claims of some plaintiffs and related motions; and plaintiff Waugh's motion to reconsider a prior dismissal order.[2] Additionally, plaintiffs have moved to have another case involving a search of an African–American woman at O'Hare (*Jones v. United States*, 99 C 4735) reassigned to this bench as a related case. Where possible, questions of class certification generally should be resolved before addressing the merits of the case. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 474–75 (7th Cir.1997). Class certification will be considered first.[3]

## I. CLASS CERTIFICATION

■ For purposes of considering a motion for class certification, the substantive allegations of the complaint are generally assumed to be true and it is also assumed that cognizable claims are stated. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 333 n. 3 (N.D.Ill.1997); *Scholes v. Moore*, 150 F.R.D. 133, 135 (N.D.Ill.1993). The merits of claims generally are not to be examined, but the "boundary between a class determination and the merits may not always be easily discernible." *Retired Chicago Police Association v. City of Chicago*, 7 F.3d 584, 598–99 (7th Cir.1993), *cert. denied*, 519 U.S. 932, 117

---

2. A motion for summary judgment by defendant Restivo is also pending, but was not fully briefed as of the time the present ruling was being completed. Also, a motion to dismiss is pending in the *Jones* case, but that case is presently before another judge and the motion is not yet fully briefed.

3. Class certification was previously denied without prejudice because the cases had been pending for months without any motion for class certification being pursued. *See Anderson v. Cornejo*, 1999 WL 35307 *1 (N.D.Ill. Jan. 11, 1999) (*"Anderson I"*). Plaintiffs subsequently renewed their class allegations and moved for certification of the classes.

S.Ct. 305, 136 L.Ed.2d 222 (1996) (quoting *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982)). In order to resolve questions of typicality or whether common questions predominate, it is sometimes necessary to determine the nature of the applicable law. *See Retired Chicago Police,* 7 F.3d at 598–99 (quoting *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)); *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 489 (S.D.Ill.1999); *Toney v. Rosewood Care Center, Inc. of Joliet,* 1999 WL 199249 \*2 (N.D.Ill. March 31, 1999); *Krause v. GE Capital Mortgage Services, Inc.,* 1998 WL 831896 \*2 (N.D.Ill. Nov. 20, 1998); *Blaz v. Galen Hospital Illinois, Inc.,* 168 F.R.D. 621, 624–25 (N.D.Ill.1996); *Nelson v. United States Steel Corp.,* 709 F.2d 675, 679–80 (11th Cir.1983).

■ The burden is on the named plaintiffs to demonstrate that all the requirements for class certification are satisfied. *Retired Chicago Police,* 7 F.3d at 596. ·Federal Rule of Civil Procedure 23(a) requires that the following four prerequisites be satisfied: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Failure to meet any single one of these requirements precludes certification of a class. *Retired Chicago Police,* 7 F.3d at 596. One of the requirements of Rule 23(b) must also be satisfied.

■ Further, the court has an independent duty to scrutinize the appropriateness of class. certification; it is not limited to arguments made by the party opposing certification. *See In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1124 (7th Cir.1979), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1980); *Barney v. Holzer Clinic, Ltd.,* 110 F.3d 1207, 1213–14 (6th Cir.1997); *Gammon v. GC Services Ltd. Partnership,* 162 F.R.D. 313, 317 n. 4 (N.D.Ill.1995); *Krause,* 1998 WL 831896 at \*2; *Williams v. State Board of Elections,* 696 F.Supp. 1559, 1560 (N.D.Ill.1988); *In re Aiello,* 231 B.R. 693, 710 (Bankr.N.D.Ill. 1999).

Plaintiffs proposed the following class definitions. For counts II, IV, VII, IX, and X, they propose that the "O'Hare Class" be defined as "All African–American women subjected to non-routine personal searches by United States Customs employees at O'Hare International Airport during the period May 7, 1996 to the present." For the Count VIII "National Class," they propose: "All airline passengers subjected to non-routine personal searches by United States Customs employees at any United States international airport during the period May 7, 1996 to the present." All the named plaintiffs are alleged to be United States citizens. Although not expressly stated, it is assumed that plaintiffs intended to limit the class to United States citizens and permanent residents. It is also claimed that no contraband materials were found during the searches of the named plaintiffs. It is assumed that plaintiffs intended to exclude from the class definition any individuals for whom the search revealed contraband materials. Plaintiffs propose the following definition of "nonroutine personal searches":

(a) pat downs, strip searches, monitored urination and/or bowel movements, visual body cavity searches, and/or physical body cavity searches that have and continue to occur in small enclosed rooms at O'Hare International Airport or in places used by United States Customs and its employees for similar purposes in other United States international airports; and

(b) strip searches, monitored urination and/or bowel movements, visual and/or physical body cavity searches, x-rays, and/or the administration of laxatives to detained airline passengers that occur at the directions of United States Customs employees at non-border facilities, such as cooperating hospitals.

As to the National Class, plaintiffs seek certification pursuant to Rules 23(b)(1) and 23(b)(2). As to the O'Hare Class, plaintiffs seek certification pursuant to Rule 23(b)(3). Before considering the specific criteria, an

aspect of plaintiff's theory of the case should be noted. In proving damages liability for the O'Hare Class counts, plaintiffs intend to show that a pattern and practice of violations existed of which defendants were aware and responsible. Relying on employment discrimination cases, *see International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 357–62, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875–81, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *King v. General Electric Co.,* 960 F.2d 617, 622–25 (7th Cir. 1992); *EEOC v. Mitsubishi Motor Manufacturing of America, Inc.,* 990 F.Supp. 1059, 1069–82 (C.D.Ill.1998), plaintiffs contend that proving the existence of a pattern or practice of constitutional violations will establish a presumption that each plaintiff was subjected to said unconstitutional conduct.

### A. Numerosity

█ The first requirement of Rule 23(a) is numerosity. *See* Fed.R.Civ.P. 23(a)(1). Plaintiffs appear to have made a reasonable estimate that the O'Hare Class would contain approximately 1,200 women and the National Class approximately 178,500 passengers. Even if the time period for the classes were to be reduced as suggested by defendants, or limited to prospective relief, there would still be more plaintiffs than it is practical to join in a single action. Also, even if the National Class were to instead be limited to a class of all O'Hare passengers subjected to nonroutine personal searches, there would be too many class members to join in a single action. Counts IX and X contain allegations regarding the Passenger Analysis Unit ("PAU"). Defendants make passing reference to such analysis being applied to only a limited number of passengers. Count IX and X, however, are not limited to claims by persons who were selected by the PAU. It is found that numerosity is satisfied as to all counts for which class certification is sought.

### B. Common Questions

█ Rule 23(a)(2) requires that there be common questions of law or fact. It is not a demanding requirement; one issue of fact or law common to all class members will suffice.

*Warnell v. Ford Motor Co.,* 189 F.R.D. 383, 390 (N.D.Ill.1999); *Battle v. White Cap, Inc.,* 1999 WL 199594 *3 (N.D.Ill. March 31, 1999); *Ruiz v. Stewart Associates, Inc.,* 171 F.R.D. 238, 242 (N.D.Ill.1997); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.,* 164 F.R.D. 659, 663 (N.D.Ill.1996). As to Counts II, IV, and VII, a common question of fact will exist as to whether the practices and policies alleged actually existed. The existence of these policies and practices will also be pertinent to Counts IX and X, as well as the common question of whether defendants conspired. Count VIII will also have a common question of whether the policy and practice alleged therein existed. The commonality requirement is satisfied.

### C. Typicality

█ Rule 23(a)(3) requires that the claims of the class representatives be typical of the claims of the class. The typicality requirement primarily focuses "on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. 'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (quoting Herbert Newberg, *Class Actions* ¶ 1115(b) at 185 (1977)). *Accord Retired Chicago Police,* 7 F.3d at 596–97. It is only necessary for the claim of a named plaintiff and the claims of the class at large to have the "same essential characteristics;" there may still be factual differences. *Retired Chicago Police,* 7 F.3d at 597 (quoting *De La Fuente,* 713 F.2d at 232); *Danis v. USN Communications, Inc.,* 189 F.R.D. 391, 395 (N.D.Ill.1999). Similar legal theories may control despite factual distinctions. *See Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992), *cert. denied,* 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993); *Clay,* 188 F.R.D. at 491–92. Here, there will be some factual differences between each particular search, but there is nothing to indicate that

the named class members' searches were atypical.[4] Similar legal theories will generally apply to all the class members. Typicality is satisfied.

## D. Adequacy of Representation

Rule 23(a)(4) requires that the named representatives be adequate representatives of the class's interests. Three elements must be satisfied: "(1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy; and (3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." *Roe v. Publishers Clearing House, Inc.,* 1999 WL 966977 *2 (N.D.Ill. Oct. 4, 1999) (quoting *Gammon,* 162 F.R.D. at 317). The present case is unusual in that there are 85 named plaintiffs. Other than the limited information contained in the complaint, no specific information has been provided regarding the named plaintiffs. However, there is no indication that any plaintiff has interests in significant conflict with those of other class members.[5] Also, plaintiffs are represented by experienced attorneys with substantial experience in civil rights and class action litigation. It is found that named plaintiffs are adequate class representatives. All the prerequisites of Rule 23(a) are satisfied.

4. The two named plaintiffs who were subjected to gynecological searches may have been subjected to an atypical search. Such searches may also distinguish these two plaintiffs because their claims for damages may be substantially higher than the claims of other plaintiffs. Whether the gynecological searches should be excluded from the class claims, represent a separate subclass, or these two plaintiffs excluded from being class representatives need not be decided at this point. *See Joncek v. Local 714 International of Teamsters Health & Welfare Fund,* 1999 WL 755051 *4 (N.D.Ill. Sept. 3, 1999); *In re Discovery Zone Securities Litigation,* 181 F.R.D. 582, 587 (N.D.Ill.1998); *Rozema v. Marshfield Clinic,* 176 F.R.D. 295, 301 (W.D.Wis.1997); *Merk v. Jewel Food Stores,* 702 F.Supp. 1391, 1395 (N.D.Ill. 1988). It would not preclude certifying a class based on the 83 other proposed representatives.

## E. O'Hare Class

### 1. 23(b)(3) Class

Whether the O'Hare Class should be certified as a Rule 23(b)(3) class will be considered next. That rule requires two findings: "[1] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Matters to consider include: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action." *Id.* Defendants contend that common questions will not predominate.

In the O'Hare Class counts, plaintiffs only name supervisory employees as defendants. Plaintiffs intend to prove that these employees were responsible for the pattern or practice of unconstitutional conduct alleged in each count. Plaintiffs argue that, by showing a pattern or practice, a presumption will arise that each member of the class was subjected to a nonroutine search as a result of unconstitutional conduct.[6] Pointing to this claimed presumption,

5. One possible exception is those plaintiffs subjected to gynecological searches. See the preceding footnote.

6. Distinct from the issue of whether applying such a presumption is appropriate, defendants argue that, as to each class member and each particular defendant, it must be shown that the particular defendant personally and directly participated in the decision to search that class member. It is true that personal involvement must be shown in order to hold the individual defendants liable for damages. *Del Raine v. Williford,* 32 F.3d 1024, 1052 (7th Cir.1994). However, "[a] superior may be personally involved by formulating and directing an unconstitutional policy, *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986), or by knowing about unconstitutional 'conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either

plaintiffs contend that individual issues as to whether Customs inspectors had cause to conduct the searches will be minimal and instead the common issues of whether a pattern or practice existed and whether each named defendant was responsible for it will predominate.

■ Plaintiffs do not point to any cases in which the pattern or practice method of proof has been applied outside the context of employment discrimination actions. The term "pattern or practice" derives from Title VII enforcement provisions available to the government. *See* 42 U.S.C. § 2000e–6(a); *King*, 960 F.2d at 622. Use of this method of proof has not been limited to actions brought by the government. *See Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 772–73, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). It also has not been limited to Title VII employment actions. *See, e.g., King*, 960 F.2d at 624 (Age Discrimination in Employment Act claim); *Catlett v. Missouri Highway & Transportation Commission*, 828 F.2d 1260, 1265 (8th Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988) (§ 1983 employment discrimination claim). As the Seventh Circuit has noted, pattern or practice is not a talismanic designation and is not to be applied rigidly, mechanically, or ritualistically. *King*, 960 F.2d at 625. For present purposes it will be assumed that it is possible to apply the pattern or practice presumption in contexts other than employment and to unlawful conduct other than discrimination. Still, the proof of a pattern or practice must be sufficiently strong to support the "judicial evaluation" that it is so routinely applied that it is more probable than not that the routine unlawful practice was the reason for the search of a particular class member. *See id.* at 624.

Issues of the existence of a pattern or practice, each particular defendant's responsibility for that pattern or practice, and whether each particular defendant's conduct constituted knowing conduct or at least deliberate indifference are issues common to the class and well suited for a class-wide determination. But even assuming plaintiffs prove the pattern or practice that they have alleged and particular defendants' responsibility, that does not fully resolve the issue of liability for individual class members. Plaintiffs contend that application of a presumption of liability to individual class members will prevent individual issues from being predominant. Defendants contend that the individual circumstances of each search would still have to be considered, thereby resulting in individual issues being predominant. In a case involving alleged pretextual searches of minorities stopped on a highway, the court stated: "where plaintiffs have alleged that the police have engaged in a presumptively invalid procedure ... a 23(b)(3) class is appropriate since the liability which the plaintiffs seek to establish is based on the operation itself rather than on the circumstances surrounding each individual stop or arrest." *Wilson v. Tinicum Township*, 1993 WL 280205 *8 (E.D.Pa. July 20, 1993) (quoting *Cliett v. City of Philadelphia*, 1985 WL 3181 *2 (E.D.Pa. Oct. 17, 1985)). Here, each O'Hare Class count must be examined to determine if it is likely to be necessary to consider the individual circumstances of each class member's search.

■ Count II is based on supervisory employees maintaining or being deliberately indifferent to a practice of African–American women being selected for searches because of their race and sex. Since based on a discriminatory practice, this count is the one most like an employment discrimination pattern or practice claim. Defendants contend that, as to each member of the class, an issue may arise as to whether the discriminatory practice was the cause of her being selected for a nonroutine search. In other words, a question may exist as to whether a particular class member would have been searched even if she had not been an African–American woman. That would require consideration of the totality of the circumstances in order to determine whether a sufficient basis otherwise existed such that the class member

knowingly or with deliberate, reckless indifference.' *Jones [v. City of Chicago]*, 856 F.2d [985,] 992 [(7th Cir.1988)]." *Id.* Accord *Miller v. Velasco*, 1999 WL 529562 *5 (N.D.Ill. July 19, 1999); *Sylwestrowicz v. Todd*, 1995 WL 519769 *2 (N.D.Ind. Aug. 10, 1995). See also *Kitzman-Kelley v. Warner*, 203 F.3d 454, 458–60 (7th Cir. 2000).

would have been selected for a search.[7] If defendants succeed at showing a sufficient basis for selecting the class member existed, they will have rebutted that the pattern or practice of discrimination caused that particular search and will not be liable to that class member. If defendants attempt to rebut liability as to a significant number of plaintiffs, individual issues will predominate as regards Count II. For example, if defendants raise this contention as to only 10% of the estimated 1,200 class members, 120 determinations of this issue would have to be resolved. It would not be unreasonable to assume that this issue would be raised as to a significant number of class members. Moreover, the burden is on plaintiffs to show that the requirements for class certification are satisfied. They have not presented facts to support that this type of dispute will not exist as to a significant number of class members.

The present case is distinguishable from *Cliett*. There, class members were being stopped solely because they were in a particular location. *See id.*, 1985 WL 3181 at *1. Therefore, no issues were likely to arise because of the specific circumstances of an individual stop. In *McGann v. Northeast Illinois Regional Commuter R.R. Corp.*, 1991 WL 152520 *1 (N.D.Ill. July 30, 1991), a possible defense was that class members consented to searches of their vehicles that were in the defendant's parking lot. That did not involve substantial individual determinations because such consent was based on a posted sign that vehicles were subject to being searched. In *Wilson*, it was claimed that highway stops were pretextual so that searches could be requested and that minorities were being selected for stops. *See id.*, 1993 WL 280205 at *1. The court held that determinations of individual circumstances of stops would be unnecessary because the stops were based on an unlawful custom or policy. *Id.* at *9. Apparently, this was be-

cause, by definition, the class only included persons who were stopped on pretextual grounds or because of being a member of a minority group. *See id.* at *1. There is no similarly defined class in the present case.[8] Because predominance is not satisfied as to Count II, a Rule 23(b)(3) class will not be certified as to that count.

■■■■ Count IV is based on supervisory employees maintaining or being deliberately indifferent to a practice of unlawful searches, seizures, and detentions. Even assuming the alleged pattern or practice is proven and plaintiffs are entitled to a presumption of individual liability, defendants would still be entitled to rebut the presumption of liability. Showing that an adequate basis existed for the search, seizure, or detention of an individual class member, that is the inspector's actions were lawful, would rebut the presumption that the class member was searched, seized, or detained pursuant to a pattern of unlawful conduct. A determination of the lawfulness of a search, seizure, or detention requires consideration of all the surrounding circumstances. *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir.1999) (*"Saffell III"*); *Ekpo v. United States*, 1992 WL 117121 *6 (N.D.Ill. May 22, 1992). If defendants contend an adequate basis existed for the lawful search, seizure, or detention of a significant percentage of the class members, individual issues of liability are likely to predominate. For example, see the discussion in § IV(E) *infra*.

*Gary v. Sheahan*, 1999 WL 281347 *2 (N.D.Ill. March 31, 1999), *appeal dismissed*, 188 F.3d 891 (7th Cir.1999), cited by plaintiffs, is distinguishable. In *Gary*, each female inmate being temporarily returned to the jail following a judicial determination she should no longer be detained was strip searched. This was a uniform policy; there was no possible issue as to individual determinations of who should be strip searched.

---

7. Likely, this would not be precisely the same question as whether sufficient cause or suspicion existed to satisfy the constitutional requirements for a nonroutine search. Presumably, because of the limited number of Customs inspectors, not every one who can constitutionally be searched is actually searched. The question here would be whether plaintiff would actually have been se-

lected for a search regardless of her race and gender, not whether she legally could have been selected.

8. *Wilson* does not explain how determinations would be made of who belonged in the class.

The only question raised regarding individual distinctions as to liability was whether all class members suffered some injury. It was clear, however, that all class members suffered some injury; the only individual question would be how severe an injury. *Gary* applied the usual rule that questions as to the amount of damages, as distinguished from questions as to whether liability exists, are not a basis for denying certification because of a predominance of individual questions. Since predominance has not been satisfied, a Rule 23(b)(3) class will not be certified as to Count IV.

■ Count VII is based on supervisory employees maintaining or being deliberately indifferent to a practice of denying due process to class members. Three types of due process violations are identified in the complaint: (a) detentions lasting for too long a period of time; (b) detentions without judicial authorization being obtained; and (c) not permitting the detainees to contact others. Unlike Counts II and IV, Count VII assumes the existence of reasonable suspicion; that is, it is based on an alleged practice of permitting this conduct when reasonable suspicion exists. Thus, individual issues of whether reasonable suspicion exists would not arise. Therefore, as to Count VII, common issues are likely to predominate.

■ It still must be considered whether, as to Count VII, a class action is the superior means of adjudication. There may be a significant savings of judicial and legal resources by jointly resolving the issues of whether plaintiffs were entitled to a judicial determination of their being held and whether they were entitled to be able to contact others. If liability is proven, many of the plaintiffs may not be entitled to a large amount of damages because not held for a lengthy period of time. Therefore, for those plaintiffs, a class action may be the most practical means for resolving these issues. With the exception of the *Jones* case, there is apparently no other plaintiff who has initiated a claim without seeking class certification. The Count VII damages claims are

appropriate for Rule 23(b)(3) class certification.[9]

■ Counts IX and X are conspiracy claims for basically the same alleged misconduct that is raised in the other O'Hare Class counts. For the same reasons that individual issues are likely to predominate in regard to Counts II and IV, individual issues are likely to predominate as regards Counts IX and X. A Rule 23(b)(3) class will not be certified for Counts IX and X.

## 2. *Rule 23(b)(2) Class*

■ Although a Rule 23(b)(3) class is inappropriate for the damages claims made in most of the O'Hare Class counts, a Rule 23(b)(1) or Rule 23(b)(2) class would be appropriate for the injunctive relief requested in all the O'Hare Class counts. These rules provide:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . .

Fed.R.Civ.P. 23(b).

■ Predominance of common issues is not a requirement under Rule 23(b)(1). *Amchem Products, Inc. v. Windsor,* 521 U.S.

---

9. For the reasons set forth in § II(B) *infra,* unnamed class members who were detained for

more than 24 hours will be excluded from all the classes.

591, 623 n. 19, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Foundation for New Era Philanthropy Litigation*, 175 F.R.D. 202, 208 (E.D.Pa.1997). Although not expressly made a requirement of Rule 23(b)(2), some courts have held that predominance and superiority are still considerations for Rule 23(b)(2) certification. *See Clay*, 188 F.R.D. at 495. Regardless, limited to the claims for injunctive relief, individual issues do not predominate. For injunctive relief, it is unnecessary to determine whether each individual class member was subjected to an unconstitutional search. Proving a pattern or practice of such conduct would be a basis for granting injunctive relief.[10] It would be a superior method of adjudication because it would avoid inconsistent rulings and defendants have acted in a manner generally applicable to the class. Injunctive relief prohibiting prospective application of the challenged practices would be an appropriate form of relief. Limited to injunctive relief, a Rule 23(b)(2) class will be certified as to all the O'Hare Class counts.

### F. National Class

Still to be considered is certification of the Count VIII National Class. As with the O'Hare Class claims for injunctive relief, the claim in Count VIII is one that is appropriate for Rule 23(b)(2) certification. It challenges a pattern or practice that has allegedly been applied to members of the class. Individual questions of liability will not have to be adjudicated to resolve the class claim. The only question is whether it is appropriate to certify a class that is national in scope. Defendants argue that it is not because the applicable law is not consistent throughout the different circuits. There, however, is no such geographical limit on class certification. *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The Supreme Court has stated that it may be con-

sidered that it is often preferable to allow several courts to pass on a given question and, "[f]or this reason, a federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts." *Id.* Defendants do not contend that other courts have not had the opportunity to address the legal standards that will apply to this case or that similar litigation is pending elsewhere. To the contrary, they contend that the issue has previously been addressed and that inconsistent standards exist. That, however, is one of the very reasons for certifying a class; to establish a consistent standard for the Customs Service to follow. The Count VIII defendants are national Customs Service officials who can implement national policies. As long as plaintiffs succeed in showing a practice that exists throughout the country, a nationwide class and nationwide relief are appropriate. The Count VIII National Class will be certified.

### G. Class Time Period

Defendants also object to including in the class persons who were searched as early as May 7, 1996. That date is two years prior to the filing of a class action that was subsequently consolidated into the *Anderson* case. It has previously been held that the statute of limitations was tolled during all or part of the initial pendency of the class actions.[11] *See Anderson II*, 1999 WL 258501 at *4. However, *Anderson I*, 1999 WL 35307 at *1, denied class certification in an order dated January 8, 1999 and entered on the docket on January 11. On January 19, a Fifth Amended Complaint was filed that again contained class allegations and the present motion for class certification was filed on November 9,

---

10. In a prior ruling, it was found that at least some of the named plaintiffs have standing to seek prospective relief. *See Anderson v. Cornejo*, 1999 WL 258501 *1–2 (N.D. Ill. April 21, 1999) ("*Anderson II*").

11. One case (*Chalk*) containing class allegations was voluntarily dismissed in favor of consolidation into the *Anderson* case which, by that time,

also included class allegations. In *Anderson II*, it was indicated that the tolling continued during the pendency of both cases and did not end when *Chalk* was voluntarily dismissed. However, it was expressly stated that, for purposes of the issues then before the court, it was unnecessary to resolve that question. *Anderson II*, 1999 WL 258501 at *4, *5.

1999. From at least January 11 to January 19, the statute of limitations likely was not tolled and possibly it was not tolled from January 11 until either the November 9 certification motion or entry of today's order granting certification. Also, absent equitable tolling or equitable estoppel, claims against defendants added to this case later than May 7, 1998 cannot go back any further than two years prior to the particular defendant being joined in the case. *See Anderson II,* 1999 WL 258501 at *4; § III *infra.* Plaintiffs concede that statute of limitations issues should be resolved before determining the appropriate time period for the class definition. They contend, however, that class certification can be granted with the question of the appropriate time period being decided prior to the issuance of notice to the class.

 First, as to the class claims for injunctive relief, the most pertinent time period is prospective. A statute of limitations does not necessarily apply to a claim for prospective, injunctive relief. *See McCarthy v. Madigan,* 503 U.S. 140, 153 n. 5, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *Lavey v. City of Two Rivers,* 994 F.Supp. 1019, 1023 (E.D.Wis.1998), *aff'd,* 171 F.3d 1110 (7th Cir. 1999); *A–C Reorganization Trust v. E.I. Du-Pont de Nemours & Co.,* 968 F.Supp. 423, 427 (E.D.Wis.1997). The pertinent question for injunctive relief is whether the alleged pattern or practice presently exists, not whether it existed in the past.[12] The precise time period selected for the class is not particularly important except that it include at least one named plaintiff who is sufficiently likely to be subjected to a nonroutine search

in the future. As to the class claims for injunctive relief, the class will include those who have been or are likely to be subjected to nonroutine searches on May 7, 1998 or later.[13]

The Rule 23(b)(3) class being certified for purposes of Count VII damages relief is a different matter. A two-year statute of limitations applies to those claims and differing time periods apparently apply to the various defendants named in Count VII, some of whom were not employed by the Customs Service during the entire time period potentially covered by the claim. Along with providing a proposed class notice, the parties shall brief the issue of an appropriate class period. For present purposes, however, the May 7, 1996 date will be used. Within five days, the parties shall confer with each other to determine if they can agree on any of the language for the notice, a procedure for distribution, the appropriate class periods, and any other issues related to class notice.[14]

## II. MOTIONS TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

In *Anderson,* defendants have moved to dismiss Counts VI, VII, and VIII for failure to state a claim and Count X (except as to plaintiff Lucy Singleton) on statute of limitations grounds.[15] In *Arnold,* defendants have moved for judgment on the pleadings as to Counts VI, VII, and VIII and as to all but three plaintiffs on Count X. The *Arnold* defendants adopt the arguments made by the *Anderson* defendants.

---

**12.** No opinion is being expressed regarding whether past practices are relevant to proving present practices.

**13.** Since at least some named plaintiffs are likely to be subjected to future nonroutine searches and no named plaintiff has been identified as being an inadequate class representative, it is unnecessary to determine which particular named plaintiffs fall within the class.

**14.** As is discussed below in § II(B), Counts VII and VIII will be dismissed in their entirety. Absent a subsequent reversal, defendants, who opposed class certification, will be the beneficiaries of certification of those counts. The parties, in their discussions, shall consider whether they can agree that Counts VII and/or VIII need not be certified. If the parties agree Count VII need

not be certified as a class action, there would be no need for Rule 23(b)(3) notice.

**15.** The *Anderson* defendants also moved to dismiss all the class counts because class certification had not yet been requested. Plaintiffs subsequently moved for class certification and defendants did not repeat this argument in opposition to that motion. To the extent defendants still raise this argument, it is rejected. No prejudice has been shown by any delay and the delay was not unreasonable. Additionally, the argument does not apply to the *Arnold* case, which was pending for a shorter period of time prior to class certification being requested.

The same standards apply to both the Rule 12(b)(6) motion to dismiss and the Rule 12(c) motion for judgment on the pleadings. *Gutierrez v. Peters,* 111 F.3d 1364, 1368 (7th Cir.1997); *Madsen v. Park City,* 6 F.Supp.2d 938, 941 (N.D.Ill.1998). A plaintiff's well-pleaded allegations of fact are taken as true and all reasonable inferences are drawn in the plaintiff's favor. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164–65, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992). A complaint need not set forth all relevant facts or recite the law; all that is required is a short and plain statement showing that the party is entitled to relief. Fed.R.Civ.P. 8(a); *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir.1996). A plaintiff in a suit in federal court need not plead facts; conclusions may be pleaded as long as the defendant has at least minimal notice of the claim. Fed.R.Civ.P. 8(a)(2); *Jackson v. Marion County,* 66 F.3d 151, 153–54 (7th Cir.1995); *Albiero v. City of Kankakee,* 122 F.3d 417, 419 (7th Cir.1997). It is unnecessary to specifically identify the legal basis for a claim. *Albiero,* 122 F.3d at 419; *Bartholet v. Reishauer A.G. (Zürich),* 953 F.2d 1073, 1078 (7th Cir.1992). It is also true, however, that a party can plead him or herself out of court by alleging facts showing he or she has no viable claim. *Jackson,* 66 F.3d at 153–54; *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); *Early v. Bankers Life & Casualty Co.,* 959 F.2d 75, 79 (7th Cir.1992). Further, as long as they are consistent with the allegations of the complaint, a plaintiff may assert additional facts in his or her response to a motion to dismiss. *Albiero,* 122 F.3d at 419; *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1428 (7th Cir.1996); *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 439–40 (7th Cir.1994); *Hrubec v. National Railroad*

*Passenger Corp.,* 981 F.2d 962, 963–64 (7th Cir.1992). Although the complaint itself need not specifically or correctly identify the legal basis for any claim, in response to a motion to dismiss that raises issues as to a claim, the plaintiff must identify the legal basis for the claim and make adequate legal arguments in support of it. *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1335 (7th Cir.1995); *Levin v. Childers,* 101 F.3d 44, 46 (6th Cir.1996); *Carpenter v. City of Northlake,* 948 F.Supp. 759, 765 (N.D.Ill. 1996). *See also Teumer v. General Motors Corp.,* 34 F.3d 542, 545 (7th Cir.1994).

## A. Count VI

In Count VI, named plaintiffs claim that Customs inspectors are individually liable to them for denying due process during the nonroutine searches by failing to obtain judicial authorization and by holding plaintiffs *in communicado.* Unlike the allegations against supervisory officials contained in Counts VII (Compl. ¶ 130 [16]) and VIII (*id.* ¶ 136), in Count VI it must be assumed that the searches, seizures, and detentions were conducted without reasonable suspicion. *See id.* ¶¶ 75–76; 126. *See also Anderson I,* 1999 WL 35307 at *3 (summarizing essentially identical allegations in the Fourth Amended Complaint).[17]

Defendants contend that Customs inspectors may, without obtaining judicial authorization, detain incoming passengers in separate rooms for the period of time necessary to complete a search. As to nonroutine searches, however, defendants must have at least reasonable suspicion. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *United States v. Johnson,* 991 F.2d 1287, 1291, 1294 (7th Cir.1993); *United States v. Yakubu,* 936 F.2d 936, 939 (7th Cir.1991). Defendants do not contend that such a rule was not well established prior to

**16.** Citations to the Complaint are to the Sixth Amended Complaint filed in *Anderson.*

**17.** Plaintiffs contend that law of the case already establishes that they have sufficiently alleged procedural due process claims. Previously, however, defendants only argued that the availability of a post-deprivation remedy precluded the possibil-

ity of a *Bivens* damages claim. *See Anderson I,* 1999 WL 35307 at *5. The arguments raised in the present motion regarding Counts VI, VII, and VIII are different and will be considered on their merits. Also, no prior ruling has been made in the *Arnold* case.

July 10, 1996.[18] It is clear that, even at the border, a citizen cannot be subjected to a nonroutine search and held *in communicado* without judicial authorization during such a search where no basis at all existed for searching the person.

In their motion to dismiss, defendants do not address the question of whether a patdown search is considered to be a nonroutine search subject to the reasonable suspicion standard. Since not raised by defendants in their motion to dismiss, ordinarily this issue would not be considered. However, the issue of the level of suspicion necessary to conduct a patdown search is raised in defendants' motion for summary judgment. Since plaintiffs have had the opportunity to respond to the arguments in the summary judgment motion, it is appropriate to apply a consistent ruling throughout this opinion and also consider, as regards the motion to dismiss, whether a patdown search is a nonroutine search requiring reasonable suspicion.

■■■ Although plaintiffs conclusorily allege that the Count VI searches are all nonroutine searches (Compl. ¶¶ 68, 126), other allegations specifically plead the nature of the patdown searches that plaintiffs label as nonroutine. Legal conclusions will be ignored where specific facts are pleaded that are to the contrary. *See Jackson,* 66 F.3d at 153–54; *Tregenza,* 12 F.3d at 718; *Early,* 959 F.2d at 79. Plaintiffs specifically allege:

> Pat down searches were typically conducted in an abusive manner. When being "patted down," plaintiffs were told to spread their hands, placing them on a wall over a metal bench. They were further told to spread their legs. If they were not perceived to have spread their legs wide enough, they were yelled at, and sometimes had their legs kicked or pushed further apart. When "patted down," the defendant Customs inspectors pushed their fingers into the clothing and skin of plaintiffs hard enough to sometimes cause pain. This probing was done all over their body, including the breast and crotch area, regardless of whether the plaintiff was wearing skin-tight clothing (such as a bathing suit) and the absence of something under the clothing was apparent. During the pat down stage of proceedings, the Customs inspectors usually asked plaintiffs if they were menstruating.

Compl. ¶ 72.

In §§ IV(C)–(D) *infra,* standard and intrusive patdown searches are defined and distinguished. To the extent plaintiffs allege patdown searches performed over the clothing, they apparently allege standard patdown searches, even if the patting down occurred over clothing in a plaintiff's crotch and breast areas. The allegations, however, are ambiguous as to whether some of the patting occurred below clothes or directly on skin in the breast or crotch area. Therefore, it must be assumed that at least some of the patdown searches were intrusive patdown searches.

As is discussed in § IV(A) *infra,* Seventh Circuit case law holds that some suspicion is required to conduct a standard patdown search. However, the law supporting such a rule was not clearly established during the 1996–98 time period in which all the searches of the named plaintiffs are alleged to have occurred. As is discussed in § IV(B) *infra,* it was not clearly established until *Saffell III,* 183 F.3d 655, which was issued on July 6, 1999. Instead, during the pertinent time period, a Customs inspector could have reasonably believed that no suspicion whatsoever was required to conduct a standard patdown search and detain a traveler *in communicado* for the period of time necessary to complete such a search. Therefore, any claim for damages based on a standard patdown search occurring prior to July 6, 1999 is barred by qualified immunity. *See* § IV(B) *infra.* Count VI will be dismissed to the extent it is based on a claim for damages for a detention incident to a standard patdown search conducted prior to July 6, 1999. It is not dismissed to the extent it is based on detention related to other types of searches, including intrusive patdown searches.

---

**18.** The earliest search alleged in the two pending complaints is the July 10, 1996 search of Gina Phillips.

## B. Counts VII and VIII

 Counts VII and VIII[19] are distinguishable from Count VI. Counts VII and VIII are against supervisory officials for permitting a practice, on reasonable suspicion alone, of detaining and searching passengers for an indeterminate period of time, without judicial authorization, and without permitting the passengers to contact anyone. In their brief in response to the motion to dismiss, plaintiffs may also be contending that they were entitled to receive *Miranda* warnings.[20] As to these claims, it must be determined whether reasonable suspicion is a sufficient basis for Customs inspectors engaging in such conduct and, if not, whether the illegality of such conduct was not clearly established until 1996 or later.[21]

 In *Montoya*, the Supreme Court held "that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." 473 U.S. at 541, 105 S.Ct. 3304. In *Montoya*, reasonable suspicion that the defendant had balloons of drugs in her alimentary canal was developed during a Customs inspection upon her arrival at a Los Angeles airport. The defendant was given the option of returning to Columbia on the next available flight, agreeing to an x-ray examination, or producing a monitored bowel movement. She chose the first option, but continued to be detained while awaiting a flight and was

told any bowel movement would be monitored. After 16 hours of waiting and a request to make a telephone call being denied, Customs officials initiated warrant proceedings and, 24 hours after the detention began, they obtained a warrant for a medical examination. *See id.* at 534–35, 105 S.Ct. 3304. The Supreme Court held that the nature of the detention was justified by the reasonable suspicion that existed. *See id.* at 542–43, 105 S.Ct. 3304. It also held that it was appropriate to detain the defendant for the period of time necessary to either verify she had contraband or determine she did not. *Id.* at 544, 105 S.Ct. 3304. The Supreme Court expressly stated that it reached no holding as to "what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Id.* at 541 n. 4, 105 S.Ct. 3304. Subsequent Seventh Circuit cases have also upheld detentions for the time period necessary to determine if the traveler had contraband. *See Johnson*, 991 F.2d at 1294 (being detained in a holding room for 40 minutes while it was being determined defendant's luggage contained heroin); *U.S. v. Yakubu*, 936 F.2d at 939 (being detained 20 hours before passing balloons with heroin). These cases support that a reasonable suspicion that contraband materials are possessed is a sufficient basis for detaining a person at the border, even without judicial authorization and without being permitted to contact others, until it can be determined that the person does not have contraband materials.

Cases also consistently hold that a reasonable suspicion that contraband is being

---

**19.** In their opening briefs, defendants contend this court lacks jurisdiction over the Count VIII APA claim. They appear to have withdrawn this argument since they do not address it in their reply. In any event, it is held that federal question jurisdiction exists as to Count VIII.

**20.** Plaintiffs refer to their allegation as being provided with no due process whatsoever and therefore as necessarily being a constitutional violation as long as they allege a circumstance under which they are entitled to due process. For there to be a deprivation of due process, however, there must be both a right to due process and a constitutionally required procedure that was denied. In response to the motion to dismiss, the burden is on plaintiff to make legal arguments identifying what procedure was

not provided. *See Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Alexander v. Board of Education of Indian Prairie School District No. 204*, 1998 WL 699020 *4–5 (N.D.Ill. Oct. 5, 1998); *Duran v. City of New York*, 1998 WL 603212 *12 (S.D.N.Y. Sept. 11, 1998). The only procedures plaintiffs identify as being denied are the ones described in the text.

**21.** When the law became clearly established would only be pertinent to qualified immunity for the damages claims contained in Count VII. It is not pertinent to the Count VII claims for injunctive relief or Count VIII which does not contain any damages claim. *Burgess v. Lowery*, 201 F.3d 942, 944 (7th Cir.2000); *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir.1996).

hidden beneath clothes or internally is a sufficient basis for conducting an intrusive patdown search [22] or a strip search and a reasonable suspicion that contraband is hidden internally is a sufficient basis for conducting a body cavity search. *See Saffell III*, 183 F.3d at 658–59 (partial strip search); *United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir.1995) (dropping of trousers and underwear); *United States v. Gonzalez–Rincon*, 36 F.3d 859, 864 & n. 2 (9th Cir.1994), *cert. denied*, 514 U.S. 1008, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995) (partial strip search); *United States v. Adekunle*, 980 F.2d 985, 988 (5th Cir.1992) ("*Adekunle I*"), *cert. denied*, 508 U.S. 924, 925, 113 S.Ct. 2380, 124 L.Ed.2d 284 (1993), *original opinion revised in part*, 2 F.3d 559 (5th Cir. 1993) ("*Adekunle II*") (strip search); *United States v. Reyes*, 821 F.2d 168, 170 (2d Cir. 1987) (strip search); *United States v. Oyekan*, 786 F.2d 832, 836–37 (8th Cir.1986) (strip search); *United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986) (body cavity search); *Brent v. United States*, 66 F.Supp.2d 1287, 1293 (S.D.Fla.1999) (strip search and body cavity search); *Saffell v. Crews*, 1998 WL 142372 *5 (N.D.Ill. March 19, 1998) ("*Saffell I*"), *aff'd in part, rev'd in part on other grounds, Saffell III, supra* (patdown under bra and underwear); *Kane v. United States*, 962 F.Supp. 27, 30 (E.D.N.Y.1997) (strip search); *United States v. Shepard*, 930 F.Supp. 1189, 1194–95 (S.D.Ohio 1996) (body cavity search). *See also United States v. Dorsey*, 641 F.2d 1213, 1216–18 (7th Cir. 1981) (distinguishing strip search standard from patdown standard).

Plaintiffs attempt to distinguish *Montoya* because, in that case, the defendant was offered alternatives to being searched or detained, that is submitting to x-rays or leaving the country. *See Montoya*, 473 U.S. at 534, 105 S.Ct. 3304. However, on reasonable suspicion, cases have upheld detentions, strip searches, and body cavity searches even when alternatives were not offered before engaging in such conduct. *See Vance*, 62 F.3d at 1156 (strip search); *Gonzalez–Rincon*, 36 F.3d at 863–64 (partial strip search without offering alternative; required to be detained for bowel movement when x-ray not possible due to pregnancy); *Adekunle I*, 980 F.2d at 988 (strip search; continued *in communicado* detention for 48 hours after voluntary x-ray revealed foreign substance in stomach); *Reyes*, 821 F.2d at 170 (strip search); *Oyekan*, 786 F.2d at 836–37 (strip search and being detained four hours); *Ogberaha*, 771 F.2d at 658 (body cavity search). While cases, including *Montoya*, take into account the offering of alternatives as part of the totality of circumstances, plaintiffs point to no case and this court has found none where it was held that reasonable suspicion alone was not enough because the person searched or detained was not offered alternatives to the search or detention.

To the extent plaintiffs contend they are entitled to *Miranda* warnings if being detained as part of a search or prior to any nonroutine questioning, such a claim is not cognizable. *Miranda* warnings are not mandated by the Constitution and the remedy for a violation of *Miranda* is limited to suppressing evidence at trial. *Sapp v. Higgins*, 1996 WL 26877 *2 (N.D.Ill. Jan. 22, 1996); *Johnson v. Carroll*, 694 F.Supp. 500, 504–05 (N.D.Ill.1988). *See also Hensley v. Carey*, 818 F.2d 646, 649–50 (7th Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 395 (1987).

Plaintiffs also cite to two cases holding that, after persons have been detained for certain periods of time on reasonable suspicion alone, proceedings to bring them before a neutral and detached judicial officer must be begun. *See United States v. Esieke*, 940 F.2d 29, 36 (2d Cir.), *cert. denied*, 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991) (within 24 hours); *Adekunle II*, 2 F.3d at 562 (within 48 hours). *But see State v. Chiejina*, 721 So.2d 748, 750 & n. 3 (Fla.Dist.Ct.App. 1998), *cert. denied*, 527 U.S. 1022, 119 S.Ct. 2366, 144 L.Ed.2d 771 (1999). All the named plaintiffs in the pending actions are alleged

---

**22.** For purposes of Counts VII and VIII, which involve practices when at least reasonable suspicion is present, it is unnecessary to consider whether some point less than reasonable suspicion would still be sufficient for a patdown search. That issue is addressed in § IV(A) *infra*.

to have been searched and/or detained on a specific day. Thus, it is implicitly alleged that none of them were detained for more than 24 hours or else the dates of an individual plaintiff's incident would cover more than one day. Since no one was detained for at least 24 hours, resolution of this issue is unnecessary for resolving named plaintiffs' damages claims and they lack standing to pursue declaratory or injunctive relief raising such an issue.[23] To the extent there would otherwise have been unnamed class members in Counts VII and VIII who were held for more than 24 hours, they will be excluded from the class because the named plaintiffs are not adequate representatives of such persons who may have a distinct legal issue and (as to Count VII) significantly differing damages.

Counts VII and VIII are based on practices pertaining to situations in which there is a reasonable suspicion of possession of contraband materials. Because plaintiffs have not alleged that they were deprived of any due process protections to which they would have been entitled in such situations, they have failed to allege a cognizable due process violation. Because, no claims are stated under current law, it is unnecessary to separately consider whether defendants are entitled to qualified immunity. Counts VII and VIII will be dismissed in their entirety, including class claims.

## C. Count X Statute of Limitations

Still to be considered is the statute of limitations argument regarding the Count X § 1986 claim, which contains a one-year statute of limitations. As previously indicated in the discussion of class certification, there is no limitation problem in regard to the claims for injunctive relief which concern presently existing practices. See § I(G) supra. Also, as defendants concede, at least some of the plaintiffs complain of injury that occurred

less than one year before the § 1986 claims were included in the complaint.

As to the § 1986 damages claims of the named plaintiffs, plaintiffs contend that their claims are timely because brought within one year of when, acting with reasonable diligence, they discovered the existence of the conspiracy.[24] The time of discovery and reasonable diligence are fact questions that need not be alleged in the complaint and cannot be directly resolved on a motion to dismiss. See Tregenza, 12 F.3d at 718; Anderson II, 1999 WL 258501 at *2; Allen v. Runyon, 1998 WL 474130 *3 (N.D.Ill. Aug. 6, 1998); Tribblet v. Sanchez, 1996 WL 364750 *3 (N.D. Ill. June 27, 1996). Defendants, however, contend that discovery of the conspiracy does not mark the accrual date. They contend that discovery of the injury, that is the allegedly unlawful search or detention, is sufficient for the § 1986 claim to accrue. If defendants are correct, the statute of limitations issue can be considered on the motion to dismiss because discovery of the conspiracy is irrelevant, negating the need to consider facts outside the complaint.

■ Ordinarily, a civil rights claim accrues at the time a person becomes or should have become aware that she was injured, that is when she knows or should have known her constitutional rights have been violated. Wilson v. Giesen, 956 F.2d 738, 740 (7th Cir.1992); Scherer v. Balkema, 840 F.2d 437, 440 (7th Cir.), cert. denied, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). This rule has been followed in § 1986 cases, but none in which it is expressly considered whether knowledge of the existence of the conspiracy itself or a failure to prevent it is relevant to the date of accrual. See, e.g., Powers v. Karen, 768 F.Supp. 46, 50 (E.D.N.Y.1991), aff'd by unpublished order, 963 F.2d 1522 (2d Cir.1992) (claim related to collection of taxes accrued when notice of levy served on plaintiff); Garland v. Shapiro,

---

**23.** Even if a named plaintiff has previously been detained for more than 24 hours, she would lack standing to pursue injunctive relief because there is no indication that such an occurrence is common enough that any named plaintiff is likely to be held for more than 24 hours following a future return trip to the United States. See Anderson II, 1999 WL 258501 at *1–2.

**24.** There is no contention by plaintiffs that the § 1986 claim relates back to the filing of the original complaint or an earlier complaint. See Fed.R.Civ.P. 15(c)(2).

579 F.Supp. 858, 859 (E.D.Mich.1984) (wrongful termination claim accrued when plaintiff received notice that he was terminated); *Edwards v. Sotomayor,* 557 F.Supp. 209, 219 (D.P.R.1983) (claim of illegal search, seizure of property, arrest, and prosecution accrued at time of last overt act of conspiracy causing injury). However, in *dictum,* two cases have assumed, without discussion, that a § 1986 claim does not accrue until the plaintiff has knowledge that the § 1986 defendant had advance knowledge of the § 1985 conspiracy and was in a position to prevent it. *See Henry v. Board of Leavenworth County,* 64 F.Supp.2d 1042, 1060 n. 31 (D.Kan.1999) (claim did not accrue at time of shooting, but when survivors should have discovered that defendants attempted to cover up the circumstances of the shooting); *Bergman v. United States,* 565 F.Supp. 1353, 1392–93 (W.D.Mich.1983) (claim did not accrue at time Freedom Riders were attacked, but more than a decade later after it was disclosed that, prior to the attack, government officials were aware of plans for the attack). *Compare also Pollard v. United States,* 384 F.Supp. 304, 308 & nn. 3–4 (M.D.Ala.1974) (wrongful death claim did not accrue at time of death, but at time surviving relatives discovered that decedent had been participant in Tuskegee Syphilis Study). In another Freedom Rider case, it was held that the claim did not accrue until the government officials' advance knowledge of plans to attack the Freedom Riders could be discovered by due diligence as long as it could also be shown that the officials attempted to conceal their involvement. *Peck v. United States,* 470 F.Supp. 1003, 1018–19 (S.D.N.Y.1979).

▓ A § 1986 claim is not directed against the persons who conspired to violate another's civil rights. Instead, it is against a person who was aware of a § 1985 conspiracy to violate civil rights and could have prevented it, but did nothing. A person may be well aware that she was directly harmed by a specific person without having any knowledge that it was part of a conspiracy, let

alone knowing that a third party was aware of the conspiratorial plans and could have prevented the injury. However, as a recent Supreme Court case reiterates, a plaintiff need not have knowledge of facts supporting all the elements of a claim before the claim accrues. *Rotella v. Wood,* 528 U.S. 549, 554–56, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Just as a RICO plaintiff need not have knowledge of the existence of a pattern of racketeering activity before a RICO claim accrues, *id.* at 556–60, a § 1986 plaintiff need not have knowledge of the existence of the § 1985 conspiracy before the § 1986 claim accrues.

▓ Not requiring knowledge of the § 1985 conspiracy for accrual to occur does not resolve the issue before the court. The usual federal accrual rule is the "injury discovery" rule. *Id.* at 554–56. Under that rule, accrual occurs when the plaintiff discovers or should have discovered both the injury and its cause. *Id.* (quoting *United States v. Kubrick,* 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)). "The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury." *Id.* In the § 1986 situation, a plaintiff cannot even suspect that a defendant was a cause of his or her injury unless he or she has reason to believe that the defendant had advance knowledge that one or more of the § 1985 conspirators was planning to or in a position to injure the plaintiff. Until the victim of the conspiracy knows that a third party had the potential to prevent the injury, she does not have sufficient knowledge that the third party was a possible cause of her injury. Applying the traditional injury discovery rule, a § 1986 claim does not accrue until a plaintiff is, or with due diligence would be, aware that she was injured and that a third party had advance knowledge of the plans to injure her.[25]

▓ In response to the motion to dismiss, plaintiffs raise the possibility that the discovery rule will set an accrual date within one

---

**25.** Adopting this discovery rule is also supported by the fact that the limitation period for § 1986 is a short one, only one year. *Compare Rotella,* 528 U.S. 549, 556–58, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (inappropriate to prolong accrual

of RICO limitation period until pattern discovered because it already has a lengthy limitation period [four years] and a possibility of a 10–year period for the pattern).

year of the filing of the § 1986 claims. Plaintiffs need not plead in the complaint that they lacked knowledge and it cannot be resolved on the motion to dismiss whether plaintiffs actually were or should have been aware of defendants' knowledge of the alleged § 1985 conspiracy more than a year before the filing of the § 1986 claims. No plaintiff's Count X claim will be dismissed on statute of limitations grounds.

## III. RECONSIDERATION OF DISMISSAL OF WAUGH

In *Anderson II*, 1999 WL 258501 at *4–5, it was held that the allegations of the complaint showed that the claims of named plaintiff Karla Waugh were untimely. None of the defendants against whom she was then bringing her individual claims [26] had been named as defendants within two years of the date she was searched (including some additional time based on tolling due to the pendency of a class action). In response to the motion to dismiss based on the statute of limitations, Waugh did not raise any arguments that required consideration of facts outside the pleadings. *See id.* at *2. Additionally, it was expressly noted in *Anderson II* that plaintiffs did not contend that equitable tolling or equitable estoppel applied, including any contention that plaintiffs, through no fault of their own and acting with reasonable diligence, were unable to identify some of the defendants. *Id.* at *5 & n. 6. *Anderson II* was issued on April 20, 1999. Almost four months later,[27] Waugh sought reconsideration on the ground that application of equitable estoppel or equitable tolling renders her claims against the Customs inspectors timely.

Waugh contends that she diligently attempted to discover the names of the Customs inspectors involved in her search, including through discovery filed before she was a named plaintiff. Defendants dispute whether Waugh can satisfy the requirements of equitable estoppel or equitable tolling. Waugh, however, is seeking reconsideration regarding a motion to dismiss. The apparent factual disputes cannot be resolved on a motion to dismiss. On the motion for reconsideration, it must be accepted that Waugh could show her claim was timely because of equitable principles. Any resolution of the factual issues would have to await summary judgment or trial. Therefore, the only question is whether it is appropriate to allow Waugh to seek reconsideration four months after a ruling by raising arguments not included in her preruling brief and expressly identified for her in the ruling.

This being a multiparty case involving multiple claims, the dismissal of all of Waugh's claims did not result in the entry of a judgment. *See* Fed.R.Civ.P. 54(b). The ten-day time limit of Rule 59(e) does not yet apply and the ruling "is subject to revision at any time before the entry of judgment adjudicating all the claims." Fed.R.Civ.P. 54(b). *See Ruehman v. Village of Palos Park*, 842 F.Supp. 1043, 1062 (N.D.Ill.1993), *aff'd*, 34 F.3d 525 (7th Cir.1994); *Pivot Point International, Inc. v. Charlene Products, Inc.*, 816 F.Supp. 1286, 1288 (N.D.Ill.1993); *U.S. for Use and Benefit of A. Hollow Metal Warehouse v. United States Fidelity & Guaranty Co.*, 700 F.Supp. 410, 411–12 (N.D.Ill.1988). Still, it is good practice to seek reconsideration within 10 days or at least within a short period of time after an interlocutory ruling. *See Turner v. Chicago Housing Authority*, 771 F.Supp. 924, 926 & n. 2 (N.D.Ill.1991), *vacated & remanded on other grounds*, 969 F.2d 461 (7th Cir.1992).

**26.** In *Anderson I*, 1999 WL 35307 at *4, it was held that plaintiffs were required to provide a more definite statement specifying the date of and the particular defendants alleged to have been involved in the specific search incident of each named plaintiff. Waugh is still listed as a plaintiff in the Sixth Amended Complaint. *See* Compl. caption & ¶ 21. Since Waugh is not included in plaintiffs' amended more definite statement filed after the Sixth Amended Complaint, her presently pending claims in the Sixth Amended Complaint apparently are the claims against the supervisory Customs officials and the Count V FTCA claim. Other than the § 1986 timeliness issue discussed in § II(C) *supra*, there apparently is no present dispute that Waugh's claims against the supervisory officials or the United States are untimely.

**27.** The motion was filed on August 10 and noticed for presentation on August 12. The court reset the presentation date to August 18.

With limited exceptions, it is particularly inappropriate to consider new arguments postjudgment on a Rule 59(e) motion. *United States v. 47 West 644 Route 38, Maple Park, Ill.*, 190 F.3d 781, 783 (7th Cir. 1999); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269–70 (7th Cir.1996); *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985) (quoting *Keene Corp. v. International Fidelity Insurance Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir.1984)); *Turner*, 771 F.Supp. at 926. The situation, however, is different when, as in the present case, an interlocutory order is being reconsidered. While the raising of new arguments following an interlocutory ruling is certainly not encouraged or condoned, it is within the court's discretion to consider new arguments. *Simmons v. City of Chicago*, 1997 WL 30999 *2 (N.D.Ill. Jan. 23, 1997); *United Air Lines, Inc. v. ALG, Inc.*, 916 F.Supp. 793, 795 (N.D.Ill.1996); *Ruehman*, 842 F.Supp. at 1065; *Bankard v. First Carolina Communications, Inc.*, 1992 WL 3694 *6 n. 3 (N.D.Ill. Jan. 6, 1992).

Here, Waugh's four-month delay in bringing the reconsideration motion goes against considering new arguments. Nevertheless, other factors favor exercising discretion to reconsider. This case involves a large number of plaintiffs and defendants. All the legal issues likely to be pertinent to Waugh's claims against the Customs inspectors will still have to be considered as regards the other plaintiffs and the facts of Waugh's search will still have to be considered in regards to her pending FTCA claim. Further, it may be that other plaintiffs will still be able to rely on the equitable principles that plaintiff seeks to invoke. It would be incongruous to permit other plaintiffs to rely on such a theory, but not Waugh because the issue of the timeliness of her claim happened to be raised earlier in the litigation. Also, Waugh is going to continue to be a plaintiff in the case even if her claims against the Customs inspectors remain dismissed and the Customs inspectors she brings claims against are also in the case as defendants against the claims of other plaintiffs. Of key importance is the fact that defendants do not contend that they have in any way been prejudiced by Waugh's delay in raising the equitable issues. For the foregoing reasons, reconsideration will be granted and Waugh's claims against defendants R. Zaczek and L. Zayner will be reinstated.[28]

## IV. MOTION FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment as to claims of six of the named plaintiffs in *Anderson* who were detained for two to five minutes, which included being taken to a private room and being subjected to patdown searches over their clothing. Defendants contend that the undisputed facts show that adequate suspicion existed to support subjecting plaintiffs to the patdown searches. At the time the motion was filed, the Fifth Amended Complaint was pending. That complaint included separate equal protection, Fourth Amendment, and due process counts, but did not separately set forth claims against supervisors. Defendants made no attempt to delineate to which counts their arguments were directed.[29] However, since the basis of the summary judgment motion was adequate suspicion to conduct a patdown search and detain plaintiffs for the limited time necessary to complete such a search, the motion would apply only to the Fourth Amendment and due process claims. It would not apply to the equal protection claims since plaintiffs could be discriminatorily selected for searches even if adequate suspicion existed to preclude a Fourth Amendment or due process claim. Defendants made no contention in their opening brief that undisputed evidence showed there was no race/gender discrimination or that no evidence existed to support that any defendant was motivated by race/gender discrimination. Therefore, the summary judgment

---

**28.** Waugh does not move to reinstate her claim against defendant S. Papa.

**29.** The presently pending Sixth Amended Complaint was filed after plaintiffs answered the sum-

mary judgment motion, but before defendants filed their reply. The reply also fails to specifically refer to the counts of the complaint.

motion will only be considered to be directed to Counts III, IV, and VI, and the aspects of Counts IX and X not based on the alleged discrimination. Even if the motion did apply to the equal protection counts, that aspect of the motion would have to be denied without prejudice because plaintiffs have not yet completed all necessary discovery for that issue. *See* Fed.R.Civ.P. 56(f).

Since the summary judgment motion is not construed as being directed to the equal protection claims, plaintiffs' Rule 56(f) motion for additional time to take discovery and gather evidence to respond to new arguments made in defendants' reply brief will be denied without prejudice. In their answer brief, plaintiffs also argued that they should be permitted to complete the depositions of all the inspectors who conducted the searches that are the subject of the summary judgment motion before being required to fully respond to summary judgment. The need for such discovery before responding is highly doubtful since plaintiffs themselves can testify regarding the circumstances of the searches and, on summary judgment, their testimony will have to be credited where it is more favorable to them than the declaration each inspector has provided. In any event, that issue has become moot because, prior to today's ruling, plaintiffs completed more discovery and were given the opportunity to file a surreply raising any additional facts that have been disclosed.[30]

■ Plaintiffs also move to strike the declarations of the inspectors, contending that the inspectors' depositions show that the declarations are not based on personal knowledge. There is no need to strike the declarations. Instead, the arguments and evidentiary assertions contained in this motion and the surreply will be considered in determining whether genuine factual disputes exist. To the extent cited deposition testimony contradicts a declaration or shows that it is noncredible, the existing discrepancy will have to be resolved in plaintiffs' favor on defendants' motion for summary judgment.

■ In their reply, defendants contend that plaintiffs failed to comply with Local Rule 56.1 (formerly Loc. Gen. R. 12(M)—(N)). Defendants contend that plaintiffs improperly included legal arguments and legal conclusions in their Rule 56.1 statements. It may occasionally be true that legal conclusions are contained in plaintiffs' statements, but the statements are far from being "replete with legal argument." Plaintiffs' Rule 56.1 statements adequately and clearly enough set forth plaintiffs' factual contentions and the support for those contentions. Plaintiffs' Rule 56.1 statements will not be stricken.

■ On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Valance v. Wisel,* 110 F.3d 1269, 1274 (7th Cir.1997); *Patel v. Allstate Insurance Co.,* 105 F.3d 365, 367 (7th Cir.1997). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir. 1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:

**30.** Defendants recently filed a document entitled "Defendants' Response to Plaintiffs' Surreplies." Leave was not requested to file it and it has not been considered.

The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *id.* at 325, 106 S.Ct. 2548 ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

### A. Level of Suspicion for a Standard Patdown Search

Prior to *Montoya*, the Seventh Circuit held that a case-by-case balancing scale approach should be applied in determining the level of suspicion required before specific searches could be conducted at the border. *See Dorsey*, 641 F.2d at 1218–19. "[T]he level of suspicion of the agent must be balanced against the level of indignity perpetrated upon the traveler." *Id.* at 1219 (quoting *United States v. Brown*, 499 F.2d 829, 833 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619 (1974)). In *Dorsey*, the defendant was taken to a separate room and patted down. The Seventh Circuit does not describe the details of the patdown, other than disclosing that the contraband drugs that were the subject of a motion to suppress were found in a cigarette package in the defendant's shirt pocket. *See Dorsey*, 641 F.2d at 1215. Thus, the particular action that was being challenged would have required only light patting over the defendant's clothes. The Seventh Circuit held that the search exceeded the scope of a routine border search, *id.* at 1215 n. 4, and required more than the no suspicion necessary for a luggage or personal effects search and less than the "reasonable suspicion" or "real suspicion" required for a strip search or body cavity search. *Id.* at 1217–18. Without setting forth a standard applicable to all patdown searches, the Seventh Circuit stated that some level of suspicion was required, with the precise amount depending on the level of intrusiveness on the traveler's dignity. *Id.* at 1218–19.

In the *Saffell* case, a bench trial was held and the district court entered findings of fact and conclusions of law. In determining whether the patdown of Saffell was justified by adequate suspicion, the district court followed the holding of *Dorsey*, applying the balancing scale approach. *Saffell v. Crews*, 1998 WL 832653 *2–3 (N.D.Ill. Nov. 20, 1998) ("*Saffell II*"), *aff'd in part, rev'd in part on other grounds*, 183 F.3d 655 (7th Cir.1999). On appeal, the Seventh Circuit "fully agree[d] with the district court that there was justification for the initial [patdown] search." *Saffell III*, 183 F.3d at 657.[31] The

---

**31.** The Seventh Circuit reversed the district court's holding that reasonable suspicion did not exist to justify the partial strip search that was

patdown in *Saffell II* involved taking Saffell to a private room, making her lean against the wall with her arms extended and legs spread, and the Customs inspector moving her hands over Saffell's entire clothed body, including her crotch area and breasts. *Saffell II*, 1998 WL 832653 at *1, 2–3. The holding with which the Seventh Circuit "fully agreed" was as follows:

> [D]oes a patdown search, which includes the placing of hands on intimate parts of the body through layers of clothing, constitute a routine border search, permitted purely as a matter of routine? In *United States v. Dorsey*, the Seventh Circuit took the view that a patdown search falls somewhere between a search of luggage requiring no suspicion at all and a strip search, which requires "reasonable suspicion." Rejecting a bright line test, the court concluded that the level of suspicion of the agent must be balanced against the level of indignity perpetrated upon the traveler. In so holding, our circuit agreed with the Ninth and Fifth Circuits that a patdown requires some level of suspicion.[4] 641 F.2d 1213, 1216–17 (7th Cir.1981).

4. Other circuits have taken different approaches. For example, in *United States v. Braks*, 842 F.2d 509, 514 (1st Cir.1988), the First Circuit opined that only strip and body cavity searches are non-routine. *See also United States v. Oyekan*, 786 F.2d 832, 835–36 (8th Cir.1986) and *United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir.1981), both of which hold patdown searches to be routine and, thus, not requiring any articulable suspicion.

The indignity to Ms. Saffell from the patdown search was minor. She was ordered to lean against a wall with her arms outstretched and her feet apart. The female Customs agent ran her hands over Ms. Saffell's body, including against and around her breasts and against her groin. Agent Crews never disturbed any of Ms. Saffell's clothing and never touched her skin directly. The entire procedure took less than a minute, was conducted in a private room, and was witnessed by another female agent. Against this experience

conducted subsequent to the patdown search. *Saffell III*, 183 F.3d at 658–59.

we must balance the suspicion of the agent. A canine had alerted to Saffell's bag and although the bag contained no contraband, there was reason to believe drugs had been on or in the bag at one time. Ms. Saffell was irate and arguing with the agents throughout the confrontation. Ms. Saffell had come from a country known to be a source of drugs and had been there three times in the last fourteen months. Ms. Saffell put off the agent's effort to discuss her visit to Jamaica. This is not a great deal of suspicion but very little is required. We believe the patdown search did not violate Ms. Saffell's constitutional rights.

*Saffell II*, 1998 WL 832653 at *2–3.

*Saffell III*'s adoption of *Saffell II*'s holding regarding the patdown clarifies that *Dorsey*'s balancing approach is still the applicable method for determining the amount of suspicion necessary to conduct a standard patdown search[32] at the border. As is discussed below, however, the vitality of *Dorsey* was not clearly established at the time of the patdown searches that are the subject of the present motion. *Saffell III* was decided in 1999. *Saffell II*, was initially issued on November 6, 1998 (*see* 1998 WL 786384), and then issued in amended form on November 20, 1998. The searches that are the subject of the summary judgment motion occurred between March 1, 1997 and March 18, 1998.

### B. Clearly Established Law Regarding Standard Patdown Searches

■ Qualified immunity protects government officials from individual liability for monetary damages as long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kitzman–Kelley v. Warner*, 203 F.3d 454, 457–58 (7th Cir.2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The burden is on plaintiffs to show that the pertinent legal principles were clearly established as of the dates of the particu-

32. The present discussion concerns what this court will call "standard patdown searches." Below, "intrusive patdown searches" will be distinguished. *See* §§ IV(C)–(D) *infra*.

lar searches. *Kitzman–Kelley*, 203 F.3d 454, 459–60.

 A Supreme Court decision on point clearly establishes the law. *Burgess v. Lowery*, 201 F.3d 942, 944 (7th Cir.2000). A Seventh Circuit decision on point ordinarily will clearly establish the law, but not if contrary decisions of other circuits or intimations in Supreme Court or Seventh Circuit cases not squarely on point raise enough doubt to justify a government official believing that a particular right is not clearly established. *Id.* "Suppose the only relevant case the Fifth Circuit had decided was very old, and every other circuit since had rejected the position taken in the Fifth Circuit's decision. It would be odd in such circumstances to suppose that right clearly established even in the Fifth Circuit, given that courts can and not infrequently do overrule decisions that seem clearly out of step with the rest of the legal universe." *Id.* Conversely, the absence of a Supreme Court or Seventh Circuit decision on point does not conclusively show the law is not clearly established. *Id.* at 944–45. It may be that the existence of the right is so clear that the issue has never been litigated, or at least never discussed in a published appellate court decision. *Id.* at 945. Also, absent a Seventh Circuit or Supreme Court opinion on point, a generally consistent line of decisions from other circuits can clearly establish a right. *Id.* Further, a contrary holding in one jurisdiction does not necessarily preclude the existence of a clearly established right in the face of consistent rulings from other jurisdictions. *Id.* at 946. The question would still "be whether a reasonable official in the position of these defendants, considering all relevant sources of guidance to the law, might have thought it reasonably possible that this court or eventually the U.S. Supreme Court would hold" that his or her challenged conduct was lawful. *Id.*

*Dorsey* was decided approximately four years prior to *Montoya*, the Supreme Court's seminal decision concerning searches and detention at the border. The Seventh Circuit did not again address the issue of the requisite legal framework for a border patdown search until *Saffell III*, more than 18 years

after *Dorsey* and subsequent to all the patdown searches presently under consideration. During the interim between *Montoya* and *Saffell III*, all the circuits that addressed the question of standard patdown searches at the border have held that such searches are routine searches that do not require any suspicion. *See United States v. Carreon*, 872 F.2d 1436, 1442 (10th Cir.1989); *United States v. Charleus*, 871 F.2d 265, 268 (2d Cir.1989); *United States v. Braks*, 842 F.2d 509, 514–15 (1st Cir.1988); *Oyekan*, 786 F.2d at 835 (8th Cir.). *See also United States v. Beras*, 183 F.3d 22, 26 (1st Cir.1999) (decided after *Saffell III*); *Gonzalez–Rincon*, 36 F.3d at 864 (9th Cir.) (*dictum*); *Shepard*, 930 F.Supp. at 1195 (S.D.Ohio); *United States v. Jerome-Oboh*, 883 F.Supp. 917, 922 (W.D.N.Y.1995). Plaintiffs do not cite any contrary cases. Moreover, in 1991, a Seventh Circuit case, without expressly stating, raised a question as to the continuing vitality of *Dorsey's* balancing scale approach. In *Johnson*, the Seventh Circuit appeared to adopt a bright-line, dichotomy approach, which would be inconsistent with *Dorsey's* balancing scale approach. *Johnson* indicates that border searches fall into one of two categories: routine border searches that require no suspicion and nonroutine border searches that require reasonable suspicion. *Johnson*, 991 F.2d at 1291–92. "In determining whether an inspection made at the border was routine, courts have focused on the degree of intrusion into a border entrant's legitimate expectations of privacy." *Id.* at 1291 (citing *Braks*, 842 F.2d at 514).

As of 1997 and 1998, taking into consideration that (a) *Dorsey* was more than 15 years old without being reaffirmed by the Seventh Circuit; (b) *Dorsey* was decided before *Montoya*; (c) other circuits had held that standard patdown searches at the border do not require any suspicion; and (d) *Johnson* indicated the adoption of a dichotomy approach, a Customs inspector could have reasonably concluded that it was not clearly established that *Dorsey* was good law or that a standard patdown search required any suspicion.

## C. Standard Patdown Searches

 So far, the discussion has focused on a standard patdown search without defin-

ing what the standard patdown procedure is. Plaintiffs contend that the patdowns to which they were subjected were not standard, but intrusive. Plaintiffs contend their patdowns were not standard because (a) the patdowns were conducted in private where they could not be seen by others; (b) the patdowns were involuntary; (c) defendants did not explain why they were being patted down; (d) plaintiffs were not told how long they would be detained; and (e) plaintiffs' breasts and crotch area were patted down. None of those factors take the patdowns outside the definition of standard. Patdown searches conducted in private rooms at airports or in other areas separated from other travelers have been held to be routine types of patdowns. *See, e.g., Saffell III,* 183 F.3d at 657 (adopting *Saffell II,* 1998 WL 832653 at *2–3) (private room at O'Hare Airport); *Braks,* 842 F.2d at 510–11, 514–15 (private room at airport); *Oyekan,* 786 F.2d at 834, 835 (same); *Shepard,* 930 F.Supp. at 1192, 1195 (same); *Jerome–Oboh,* 883 F.Supp. at 919–20, 922 (train crossing border, traveler removed to dining car). Patting down in the breast and crotch area also does not turn the patdown into an intrusive patdown search requiring reasonable suspicion. *See, e.g., Saffell III,* 183 F.3d at 657 (adopting *Saffell II,* 1998 WL 832653 at *2–3); *Jerome–Oboh,* 883 F.Supp. at 920, 922. *Cf. Terry v. Ohio,* 392 U.S. 1, 17 n. 13, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting Priar & Martin, *Searching & Disarming Criminals,* 45 J.Crim. L.C. & P.S. 481 (1954)) (describing standard patdown for weapons as: "[T]he officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin area about the testicles, and entire surface of the legs down to the feet."); *United States v. Rodney,* 956 F.2d 295, 298 (D.C.Cir.1992) (patdown search not unusually intrusive when it included running hands over male's outer garments in his

crotch area); *Stewart v. Rouse,* 1999 WL 102774 *3–4 (N.D.Ill. Feb. 22, 1999) (placing hands on breasts and in between legs during patdown search incident to arrest distinguished from fondling during patdown). The additional factors cited by plaintiffs are all standard procedures at the routine stage of questioning an incoming traveler. Moreover, none of the searches presently under consideration lasted more than five minutes.

### D. Intrusive Patdown Searches

 Patdowns become intrusive and require reasonable suspicion when the inspector reaches under the traveler's clothes, particularly in the breast and crotch area. *Saffell I,* 1998 WL 142372 at *5.[33] *Cf. Schmidt v. City of Lockport, Ill.,* 67 F.Supp.2d 938, 944 (N.D.Ill.1999) (during search incident to arrest, reaching under sweater to touch braless female's bare breasts and reaching under her pants is more intrusive than the ordinary patdown). Fondling of a traveler's genital area, breasts, or buttocks area during a patdown would also constitute an intrusive patdown. *See Watson v. Jones,* 980 F.2d 1165, 1165–66 (8th Cir. 1992) (during daily patdowns at prison, female guard's tickling and fondling of male inmates' genitals, anus, lower stomach, and thigh areas was a "physically intrusive patdown"); *Stewart,* 1999 WL 102774 at *3–4 (during search incident to arrest, police officer "aggressively groped [arrestee], grabbed her groin, and grabbed her breasts with two hands," stroked her buttocks, and joked about whether he was actually searching her, all of which constituted fondling).

Prior to 1996, it was well established that strip searches at the border required reasonable suspicion. *See* § II(B) *supra.* Directly touching genitals, breasts, or buttocks is clearly more intrusive than observing such body parts unclothed. *Schmidt,* 67 F.Supp.2d at 944. During the 1996 to 1998

---

**33.** *Saffell I* is the district court's ruling on summary judgment. For purposes of summary judgment, it was assumed to be true that, during the patdown, the Customs inspector reached under Saffell's bra and under her underwear, examining Saffell's entire pubic area and inserting her finger in Saffell's vagina. Following the bench trial, the merits of the summary judgment ruling

were not before the Seventh Circuit. Instead, different facts were before the Seventh Circuit based on the findings at the bench trial. The Seventh Circuit expressly noted that the case would have been "more difficult" if the summary judgment facts had been before it. *Saffell III,* 183 F.3d at 657.

time period, a Customs inspector could not have reasonably believed that she could run her hands beneath clothes, directly touching a woman's breasts, pubic area, or buttocks even absent reasonable suspicion.

Arguably, even without a case on point, no Customs inspector could reasonably believe that it could be appropriate to fondle a female traveler's breasts, crotch area, or buttocks, even above her clothes. By fondle, this court means in a sexual or sexually suggestive manner. The plaintiffs under consideration, however, do not contend that they were fondled. Instead, some contend they were aggressively groped. Plaintiffs point to no cases discussing border searches involving above-clothes, aggressive patting down in the crotch or breast area and this court has not found any. At some point, repeated patting of any area of the body, and particularly those areas, would require an increased level of suspicion. Where the line should be drawn, however, was not clearly established during the 1996 to 1998 time period.

### E. Application to Plaintiffs Before the Court

For purposes of summary judgment, defendants take as true for each of the plaintiffs that they were searched in a certain manner alleged in the complaint. It is assumed that each plaintiff was taken to an enclosed private room, required to place her hands on the wall and spread her legs apart, and then patted down by having a female Customs inspector run her hands over the plaintiff's body searching for objects in or below the clothing, including the breast and crotch areas. Most of the plaintiffs provide declarations containing additional descriptions as to the nature of the search. Additional statements included in the declarations are as follows.

Karen Blocker: "I was groped and searched from head to toe."

Yvette Casey: "I was not allowed to tell our ride that I was going to be delayed. During the pat down, my legs were kicked apart, I was forced to put my hands up against the wall and I was groped from head to toe several times (I had been asked to take off my sweater). In the course of doing this the inspector felt my breasts and crotch area in a very intrusive, embarrassing and humiliating fashion. This process clearly took longer than the two minutes indicated by [Customs inspector] Rocha in her declaration."

Stacy Harris: "On June 21, 1997 I was ... made to take off my shoes, turn around, spread my legs, and stand back from a wall. [Customs inspector] Martinez kicked my legs further apart so that I lost my balance and fell forward toward the wall. She searched me by pushing her hand up my vagina, through my clothes. She did this 4 to 6 times, and it was painful. She also groped me around my breasts and the rest of my body. It was a painful, humiliating and embarrassing procedure.

"Again [on September 28, 1997], I was taken to a small, windowless room, told to take my shoes off and went through a similar process as that described above. It was very abusive."

Katie Jackson: No additional description.

Ruby Pittman: "I have muscular dystrophy, .... Although I can walk, slowly and with effort, I use a wheelchair if I have to walk long distances.

"... The first officer asked if I could lay down on the bench to be searched. I said I could but I would have to be picked up because the bench is too low. She asked, well, can you lift up you arms over your head? I said no, only to about shoulder height. She told me to lift up my arms up that way and then felt with her hands over my chest and then back down over my back and down and between my legs and on my thighs. She said, you don't have on much."

Evelyn Shelton: "During the pat down the two female inspectors treated me abusively .... I was groped from head to toe with my feet spread (and an inspector placed her heel on my foot); this included feeling and groping over my breasts and crotch area in an extraordinarily intrusive manner; my foot was kicked while an inspector told me to spread my legs wider, my arms were spread

on the wall, and I was bent over a small metal bench in a small cell like room."

Jackson and Pittman do not show that they were subjected to any more intrusive a patdown than the standard patdown search. Therefore, at the time, the Customs inspectors that searched them could reasonably have believed that they could constitutionally perform the searches without having any suspicion. Jackson's and Pittman's Count III, IV, and VI damages claims will be dismissed. Also, their Count IX and X damages claims will be dismissed except to the extent that such counts are based on a claim of discrimination.

■ The only additional fact that Blocker attempts to add to the general allegations is her description of the search as being "groped." A party must respond to summary judgment by providing specific facts. *Selan*, 969 F.2d at 564; *Hispanics United of DuPage County v. Village of Addison, Ill.*, 958 F.Supp. 1320, 1325 (N.D.Ill.1997); *Williams v. National Housing Exchange Inc.*, 949 F.Supp. 646, 650 (N.D.Ill.1996). Conclusorily stating that she was groped does not show that she was subjected to an intrusive search. A plaintiff must describe what she means by groped so that it can be determined whether she was subjected to an intrusive patdown search. Similarly, Shelton's conclusory statement that she was groped in an extraordinarily intrusive manner does not provide the specifics necessary to show that she was subjected to an intrusive patdown search. Since Blocker and Shelton have not provided facts showing that they were subjected to an intrusive patdown search, it must be assumed that they were subjected to standard patdown searches. Therefore, the Customs employees allegedly responsible for their patdown searches could reasonably have believed that the searches could be constitutionally performed without there being any suspicion of possession of contraband. Blocker's and Shelton's Count III, IV, and VI damages claims will be dismissed. Also, their Count IX and X damages claims will be dismissed except to the

extent that such counts are based on a claim of discrimination.

Similarly to Shelton, Casey's declaration conclusorily refers to being groped in a very intrusive, embarrassing, and humiliating manner. Like Shelton, she does not provide any specifics as to how her search was more intrusive than a standard patdown search. Casey adds the specifics that her entire body was patted "several times" and that the process took longer than two minutes. She also states that she was asked to remove her sweater without specifying whether she did actually remove her sweater. On defendant's summary judgment motion, it must be assumed that plaintiff did remove her sweater. However, her statement as to the clothes she was wearing, including accompanying photographs, show that she was still wearing a tank top under the sweater. Therefore, the patting down of her breasts was still over clothes. A patdown that consists of "several" (three or four) passes over the body taking a total of more than two minutes still falls within the definition of a standard patdown. Even if it does not, as discussed in § IV(D) *supra*, as of July 1997 the law was not clear that such a patdown constituted an intrusive patdown search requiring a higher level of suspicion. Therefore, the Customs employees allegedly responsible for Casey's patdown search could reasonably have believed that the search could be constitutionally performed without there being any suspicion of possession of contraband. Casey's Count III, IV, and VI damages claims will be dismissed. Also, her Count IX and X damages claims will be dismissed except to the extent that such counts are based on a claim of discrimination.

■ Harris's testimony is different. She has claims concerning both a June 21, 1997 arrival at O'Hare and a September 28, 1997 arrival at O'Hare. Although done through her clothes, Harris states that during the June patdown search, Customs inspector Martinez pushed her hand up Harris's vagina six times in a painful manner.[34] That is close enough to a cavity search and done repeated-

---

**34.** Harris states "4 to 6 times," but on defendants' summary judgment motion it must be assumed that it was six times.

ly enough to be more than just a standard patdown search. A Customs employee could not reasonably have believed that she had not gone beyond a standard patdown search to conducting an intrusive search requiring reasonable suspicion. Since, on the facts assumed to be true for purposes of summary judgment, Harris was subjected to an intrusive patdown search on June 21, 1997, it must be determined whether the undisputed facts show that search was supported by reasonable suspicion.

The September search of Harris is different. She states it was "similar," not the same. Since she does not specify in what manner the searches were similar and does not specifically state that she was again subjected to having a finger pushed into her vagina, Harris has not shown that the September search was intrusive. As to the September 28, 1997 patdown search, Harris's Count III, IV, and VI damages claims will be dismissed. Also, her Count IX and X damages claims based on the September 28, 1997 search will be dismissed except to the extent that such counts are based on a claim of discrimination.

Relying on Custom inspector Olga Martinez's declaration, defendants contend that the basis for the June 21, 1997 search of Harris was (a) she arrived from Jamaica, an alleged source country for illegal narcotics; (b) she stated she was unemployed; (c) she had made frequent prior trips to Jamaica; (d) she appeared to be excessively nervous; (e) she was wearing loose-fitting clothing; and (f) portions of her anatomy had a bulky appearance. However, on defendants' summary judgment motion, plaintiff's declaration must be credited to the extent it disagrees with the declaration of Martinez and is more favorable to plaintiff. Harris does not dispute the flight was from Jamaica, but adds that she had been there for a week. Harris states that she told Martinez that she was a computers system technician for Ameritech and that she had worked there since 1984. Harris admits she told Martinez that, since 1994, she had visited Jamaica regularly, but adds that she explained that she did so because she had four weeks of vacation per year, it is an inexpensive vacation, and she has friends in Jamaica whom she enjoys visiting. Harris denies appearing nervous and denies that any of her anatomy appeared bulky. She also testifies that she would have been wearing an outfit that was not so baggy or loose-fitting that her figure could not be discerned. Harris also adds that, prior to the patdown, her luggage and purse were thoroughly searched with nothing being found. She also states that nothing was under her clothes and it can be reasonably inferred that a standard patdown would have revealed this fact.

Resolving any genuine factual disputes in plaintiff's favor, the only facts that Martinez had to support reasonable suspicion were plaintiff's arrival from Jamaica and that she traveled there regularly. Also to be considered are the facts that plaintiff had provided an explanation for her regular trips to Jamaica; no evidence of being a drug smuggler had been found in plaintiff's luggage or purse, including no evidence of any lubricants or stomach medications often used by people who have swallowed or inserted contraband; a standard patdown search would have disclosed nothing hidden under plaintiff's clothes; there was no evidence of distension in plaintiff's abdomen or elsewhere that might indicate internal contraband; and plaintiff had spent a week in Jamaica, not a quick visit sometimes made by smugglers. Regular travel to Jamaica is not a sufficient basis for reasonable suspicion of internal drug smuggling where less intrusive search techniques and other factors failed to provide any indication of smuggling. *Cf. Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (travel from source city for cocaine, arriving early in morning when law enforcement activity is diminished, attempted concealment of travel with companion, and carrying only a shoulder bag was not grounds for reasonable suspicion supporting investigatory stop); *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir.1997) (license plate from drug source state is not alone a basis for reasonable suspicion of illicit activity); *Saffell I*, 1998 WL 142372 at *5 (flight from Jamaica and dog alert do not constitute reasonable suspicion for intrusive patdown in light of other factors going against suspecting traveler of drug smug-

gling); *Brent,* 66 F.Supp. at 1263–64 (arrival from Nigeria on same flight as native Nigerian and vague answers to some questions did not constitute reasonable suspicion for strip search and body cavity search where other answers to questions and other information were inconsistent with internal drug smuggling). Harris's claims based on the June 21, 1997 search will not be dismissed.

## V. RELATEDNESS

■ Presently pending before another judge of this court is *Jones v. United States,* 99 C 4735. In that case, Cynthia Jones, alleges that, on August 4, 1997, she was subjected to a patdown and strip search by Customs inspectors following her arrival at O'Hare Airport. She claims that adequate suspicion to conduct such searches were not present and also that she was subjected to such searches because she is an African–American woman. Jones is presently represented by attorneys who also represent named plaintiffs in the *Anderson* and *Arnold* cases. As defendants, she names both a Customs inspector and a number of supervisory Customs employees. All the defendants, except the one named Customs inspector, are named as defendants in the *Anderson* and/or *Arnold* case. The four pending counts in *Jones* are basically the same as Counts I, II, III, IV, VII, and IX of the *Anderson* and *Arnold* complaints. Defendants have filed a motion to dismiss in *Jones,* for which plaintiff's answer is overdue. The judge presiding over *Jones* previously granted an extension of the briefing schedule after denying a motion to stay proceedings.

Since these cases involve common issues of law and fact, they are clearly related cases as that term is defined in this court's Local Rules. *See* Loc. R. 40.4(a)(2). The *Jones* case may be reassigned to this bench if all of the following criteria are satisfied.

(1) both cases are pending in this Court;

(2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;

(3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

(4) the cases are susceptible of disposition in a single proceeding.

Loc. R. 40.4(b). The Seventh Circuit recently criticized this court for not consolidating before a single judge a number of cases filed by a single law firm and in which there was "substantial overlap" of issues and parties. *See Smith v. Check–N–Go of Illinois, Inc.,* 200 F.3d 511, 513 n.* (7th Cir.1999).

It is undisputed that the first and third criteria are satisfied. Defendants oppose reassignment, contending the other two criteria are not satisfied. Defendants contend reassigning the case will not satisfy the second criteria because the particular facts of the *Jones* case can be just as efficiently tried by another judge. That contention ignores the common legal standards that will apply to both cases. Reassigning the case will only require that one judge decide the pertinent legal issues. This contention also ignores that the allegations against the supervisory defendants involve common issues of fact. Additionally, if plaintiffs are able to rely on the pattern or practice method of proof, there will be common facts to prove so as to apply the pattern or practice presumption to Jones's particular search. The second criteria is clearly satisfied.

Defendants also contend the fourth criteria is not satisfied because the individual facts of Jones's search will have to be separately considered. Again, the common issues of law and fact, including any application of the pattern or practice method of proof, can be resolved in a single proceeding even if some additional facts also have to be determined as to each individual plaintiff. The fourth criteria is satisfied.

Plaintiffs' motion for reassignment based on relatedness will be granted. At the next status hearing, the parties shall be prepared to address the question of whether the *Anderson* complaint should be amended to include Jones and/or the *Arnold* plaintiffs and defendants in a single complaint. Also, prior to the next status hearing, the parties shall meet to determine whether they can agree as to the application of today's ruling to Jones's individual claims so as to preclude

the need for any further briefing or any ruling on the motion to dismiss pending in the *Jones* case.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motions for class certification in 97 C 7556 [152–1] and 99 C 3786[0–1] are granted in part and denied in part. The following classes are certified:

(a) For purposes of injunctive relief on Counts II, IV, VII, IX, and X: "All African–American women subjected to nonroutine personal searches by United States Customs employees at O'Hare International Airport during the period May 7, 1998 to the present who were detained for 24 hours or less."

(b) For purposes of injunctive relief on Count VIII: "All airline passengers subjected to nonroutine personal searches by United States Customs employees at any United States international airport during the period May 7, 1998 to the present who were detained for 24 hours or less."

(c) For purposes of damages relief on Count VII: "All African–American women subjected to nonroutine personal searches by United States Customs employees at O'Hare International Airport during the period May 7, 1996 to the present who were detained for 24 hours or less."

(d) As to all three class definitions: (i) class members are limited to those persons who are United States citizens or United States permanent residents; (ii) excluded from the class are any persons for whom the nonroutine search revealed the person possessed contraband materials; and (iii) "nonroutine personal searches" are defined as: (a) patdowns, strip searches, monitored urination and/or bowel movements, visual body cavity searches, and/or physical body cavity searches that have and continue to occur in small enclosed rooms at O'Hare International Airport or in places used by United States Customs and its employees for similar purposes in other United States international airports; and (b) strip searches, monitored urination and/or bowel movements, visual and/or physical body cavity searches, x-rays, and/or the administration of laxatives to detained airline passengers that occur at the directions of United States Customs employ-

ees at non-border facilities, such as cooperating hospitals.

(2) By March 27, 2000, both sides shall submit their proposed notice to the Rule 23(b)(3) class and a plan for distribution of the notice. Additionally, an accompanying brief shall address the appropriate class periods for the three class definitions, whether notice should be sent regarding certification of the Rule 23(b)(2) classes, and any other pertinent issues regarding notice or class certification.

(3) Defendants' motions to dismiss parts of the Sixth Amended Complaint in 97 C 7556 [144–1] and for partial judgment on the pleadings in 99 C 3786 [14–1] are granted in part and denied in part. Counts VII and VIII of both cases are dismissed in their entirety. Count VI is dismissed in part; the damages claims in Count VI that are based on detentions incident to standard patdown searches that occurred prior to July 6, 1999 are dismissed.

(4) Plaintiff Karla Waugh's motion for reconsideration in 97 C 7556 [131–1] is granted. Waugh's Count I, III, and VI claims against defendants R. Zaczek and L. Zayner are reinstated.

(5) In 97 C 7556, plaintiffs' Rule 56(f) motion for additional time to take discovery and gather evidence to respond to new arguments made in defendants' reply brief [146] and motion to strike the affidavits of certain defendants filed in support of summary judgment [159] are denied without prejudice.

(6) In 97 C 7556, defendants' motion for summary judgment [94] is granted in part and denied in part. The Count III, IV, and VI damages claims and Count IX and X damages claims (except to the extent that such counts are based on a claim of discrimination) of plaintiffs Karen Blocker, Yvett Casey, Stacy Harris (9/28/1997 search only), Katie Jackson, Ruby Pittman, and Evelyn Shelton are dismissed.

(7) The motion for reassignment of related case filed in 99 C 4735[19] is granted. It is found that case No. 99 C 4735 is related to Case No. 97 C 7556 under Local Rule 40.4. It is recommended that case No. 99 C 4735 be reassigned to the calendar of Judge Hart.

(8) Status hearing set for March 29, 2000 at 11:15 a.m.

## MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

As presently constituted, this case has approximately 90 named plaintiffs, all of whom are African–American women who were allegedly searched by employees of the United States Customs Service at Chicago's O'Hare International Airport following their arrivals on international flights. Named as defendants are the United States, the Customs Service, and approximately 70 current or former employees of the Customs Service. In *Anderson v. Cornejo*, 199 F.R.D. 228 (N.D.Ill.2000) ("*Anderson IV*"), class certification was granted as to certain claims, *see id.* at 237–45; Counts VII and VIII in their entirety and Count VI in part were dismissed, *see id.* at 245–52; and certain claims of six plaintiffs were dismissed on summary judgment, *see id.* at 253–62. Three motions are presently pending. Plaintiffs seek reconsideration of (a) the denial of Rule 23(b)(3) class certification as to certain counts, (b) the dismissal of Counts VII and VIII, and (c) the grant of summary judgment as to the six plaintiffs. Defendants seek reconsideration of the denial of summary judgment as to one search of a particular plaintiff. Last, plaintiffs have moved to compel the production of certain computer data.[1]

Plaintiffs' motion for reconsideration will be considered first. Plaintiffs contend that a change of the definition for the class could result in the damages claims in Counts II, IV, IX, and X being certified. Certification was denied as to those counts on the ground that individual issues (of whether particular plaintiffs were unlawfully searched) would predominate. *See Anderson IV*, 199 F.R.D. at 241–43. It was noted that *Wilson v. Tinicum Township*, 1993 WL 280205 (E.D.Pa.

July 20, 1993), found it appropriate to certify a Rule 23(b)(3) class concerning searches at a highway stop because the focus was on the operation itself instead of the individual circumstances surrounding each stop. *See Anderson IV*, 199 F.R.D. at 241 (citing *Wilson*, 1993 WL 280205 at *8). In the present case, it was found that it is likely that, in determining damages liability to individual plaintiffs, individual issues as to the nature of the searches would often have to be considered. *Wilson* was distinguished because, in that case, the practice of conducting highway stops was being challenged and the class itself only included minorities who were stopped solely on the basis of pretext.[2] *Anderson IV*, 199 F.R.D. at 242. Therefore, by definition, the *Wilson* class could not include plaintiffs for whom an individual question of liability existed. Plaintiffs suggest that, in the case *sub judice*, the class could be defined as only including persons who were searched without adequate suspicion or because of race. That, however, does not solve the problem of individual issues predominating. Determining who belonged to such a class would be a necessary determination for the award of any damages. To determine who belonged in the class, it would still have to be determined which persons were unlawfully searched. Therefore, it would still be likely that individual issues would predominate. No additional counts will be certified as a class action.

In Counts VII and VIII, it is alleged that plaintiffs, "on nothing more than alleged 'reasonable suspicion,'" were held too long, without judicial authorization, and in nonpublic areas where they could not contact others. In *Anderson IV*, this allegation was understood to mean that plaintiffs were alleging that this constituted the denial of due process even assuming reasonable suspicion existed. *See Anderson IV*, 199 F.R.D. at 243, 248. On reconsideration, however, plaintiffs clarify

---

**1.** Subsequent to *Anderson IV*, plaintiffs filed their Seventh Amended Complaint in the *Anderson* case. *Anderson* now contains the claims of all plaintiffs, including those who were previously named in the *Arnold* and *Jones* cases. The *Arnold* and *Jones* cases were thereafter dismissed without prejudice. The numbering of counts and

the allegations in the Seventh Amended Complaint are the same as in the complaints that were the subject of discussion in *Anderson IV*.

**2.** As was noted in *Anderson IV*, 199 F.R.D. at 242 n. 8, the *Wilson* opinion does not explain how membership in the class would be determined.

that they mean that defendants contended the searching employees had reasonable suspicion, but reasonable suspicion did not necessarily exist. That is a reasonable construction of the allegation.[3] Construed in this manner, though, the class certification of Count VII must be limited to certification for purposes of injunctive relief only. This is so because, like the other damages counts, it will now be necessary to determine whether reasonable suspicion existed regarding a particular plaintiff. Therefore, the prior certification of a Count VII damages class will be vacated. This means that the classes that remain certified are all pursuant to Rule 23(b)(2) and are all limited to injunctive relief.

The prior holding, see *Anderson IV*, 199 F.R.D. at 248–49, that no due process claim is stated where reasonable suspicion existed to search the plaintiff will stand. Also, as previously held, plaintiffs have no due process claim based on the failure to give Miranda warnings. *See id.* at 249. Further, as with Count VI, *see id.* at 246–47, the Count VII damages claim remains dismissed to the extent it is based on a standard patdown search occurring prior to July 6, 1999. Counts VII and VIII will be reinstated, but only to the extent they are based on searches without reasonable suspicion, and, as to the Count VII damages claim, to the extent not based on a standard patdown search occurring prior to July 6, 1999.

Plaintiffs' remaining argument concerns the grants of summary judgment on qualified immunity grounds.[4] It was held that, as of the time of the searches under consideration (1997 and 1998), Seventh Circuit case law did not clearly establish that a standard patdown search required suspicion. *Id.* at 257. Therefore, to the extent the undisputed facts showed a plaintiff was subjected to a standard patdown search,[5] her claim was dismissed on summary judgment because (for purposes of a damages remedy) no suspicion was required to conduct such a search. *See id.* at 259–61. Plaintiffs do not dispute *Anderson IV's* conclusion as to the state of Seventh Circuit case law as of 1997 and 1998. Instead, they contend that defendants are not entitled to qualified immunity because, during the pertinent time period, the Customs Service's Personal Search Handbook,[6] which is distributed nationally, provided that "some or mere suspicion" was required to conduct a patdown search. The Handbook cites *United States v. Rivera–Marquez*, 519 F.2d 1227 (9th Cir.), *cert. denied*, 423 U.S. 949, 96 S.Ct. 369, 46 L.Ed.2d 285 (1975), as an example of what constitutes some or mere suspicion. Plaintiffs contend that, despite any ambiguity in then-existing Seventh Circuit case law, defendants could not have acted within objectively reasonable discretion where their conduct was contrary to the Customs Service's own rules.

▇▇ Citing *Hammond v. Kunard*, 148 F.3d 692, 697 (7th Cir.1998), plaintiffs contend that what the officers knew at the time of the searches must be considered and that this would include knowledge of the cited provision of the Handbook. *Hammond's* reference to a defendant's knowledge, however, refers to the facts the defendant knows about the particular situation. In this case, that would be the facts a searching defendant knows about the plaintiff being searched. The defendant's actual knowledge about the applicable law is not a factor to be considered in ruling on qualified immunity. *See Hammond*, 148 F.3d at 696–97; *Woods v. Indiana University–Purdue University at Indianapolis*, 996 F.2d 880, 887 (7th Cir.1993). More to point, violation of an administrative rule or regulation does not preclude applying quali-

---

3. Even if the clarification is inconsistent with the language of the complaint, it would be appropriate to permit an amendment.

4. Although plaintiffs raise this argument as to the summary judgment ruling, it would also apply to the partial dismissal of Count VI, *see Anderson IV*, 199 F.R.D. at 247, and today's application of this holding to the Count VII damages claim.

5. For an explanation of the distinction between a standard and intrusive patdown search, see *Anderson IV*, 199 F.R.D. at 258.

6. No opinion is expressed regarding whether the contents of the Handbook are binding on the Customs Service or its employees.

fied immunity where the pertinent constitutional law is not clearly established. *Davis v. Scherer*, 468 U.S. 183, 194–96, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Stevens v. Umsted*, 131 F.3d 697, 707 (7th Cir.1997); *Krocka v. Riegler*, 958 F.Supp. 1333, 1344–45 (N.D.Ill. 1997). The qualified immunity ruling will not be modified.

In *Anderson IV*, summary judgment was denied with respect to the June 21, 1997 search of plaintiff Stacy Harris. *See Anderson IV*, 199 F.R.D. at 260–62. Defendants seek reconsideration, contending that Harris's affidavit and deposition testimony are not clear enough regarding the nature of the search in her vaginal area. Having considered defendants' present contentions, the affidavit, and the deposition testimony, no reason is found to modify the prior decision. *Anderson IV* accurately describes the facts that should be assumed to be true for purposes of summary judgment and, as stated in *Anderson IV*, those facts constitute a violation of constitutional law that was clearly established in June 1997. Defendants' motion for reconsideration will be denied.

■ The last issue to consider is plaintiffs' motion to compel. Defendants have provided to plaintiffs four datasets in computer-readable format concerning passengers who were searched upon arriving at O'Hare Airport. As to three of the datasets, information identifying the passengers was redacted. Plaintiffs seek the identifying information for all passengers who were African–American women subjected to a nonroutine personal search. Arguably, such passengers would all be members of the certified class and plaintiffs' attorneys contend that they have the right to confer with their clients, including unnamed class members. Defendants imply that the real motivation for this request is so the attorneys can solicit additional clients.

As previously discussed, class certification is being modified to limit it to injunctive relief. Therefore, the proper members of the class are not necessarily all African–American women who were subjected to nonroutine personal searches in the past, but only those who would be likely to be subjected to such searches in the future. *See Anderson IV*, 199 F.R.D. at 245; *Ledford v. City of Highland Park*, 2000 WL 1053967 *1 (N.D.Ill. July 31, 2000). As stated in *Anderson IV*, 199 F.R.D. at 245 & n. 13, the May 7, 1998 cutoff date for the class was a somewhat arbitrary date that was subject to revision. The class definition for Counts II, IV, VII, IX, and X will be modified to be: "All African–American women who (a) after May 7, 1998 were and likely in the future will be or (b) will in the future be: subjected to nonroutine personal searches by United States Customs employees at O'Hare International Airport and who were or will be detained for 24 hours or less." *Cf. Ledford, supra.* This definition more accurately reflects an appropriate class for which standing will be properly satisfied. *Id.* The Count VIII class definition will be similarly modified. The additional qualifiers and definitions contained in the *Anderson IV* order will remain in effect. *See Anderson IV*, 199 F.R.D. at 263 (1(d)).

Taking into account this more accurate definition of the classes for injunctive relief, it cannot be assumed that all African–American women who have previously been subjected to a nonroutine personal search are members of the class. Only those who are likely to again be subjected to such a search would be members of the class. Additionally, even if actual unnamed class members could be identified, plaintiffs have not shown a particular need for contacting unnamed class members. Plaintiffs' motion to compel will be denied.

At the next status hearing, the parties shall be prepared to address the question of what notice, if any, presently needs to be sent to the class.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motion for limited reconsideration [190] is granted in part and denied in part. Counts VII and VIII are reinstated, but limited to the claim that the alleged searches were without reasonable suspicion. Also, the Count VII damages claim, to the extent it is based on a standard patdown search occurring prior to July 6, 1999, remains dismissed.

(2) Defendants' motion to alter or amend judgment [191] is denied.

(3) Plaintiffs' motion to compel [212] is denied.

(4) Class certification of the Count VII damages claim is vacated. Class certification is modified to be as follows:

(a) For purposes of injunctive relief on Counts II, IV, VII, IX, AND X: "All African–American women who (a) after May 7, 1998 were and likely in the future will be or (b) will in the future be: subjected to nonroutine personal searches by United States Customs employees at O'Hare International Airport and who were or will be detained for 24 hours or less."

(b) For purposes of injunctive relief on Count VIII: "All airline passengers who (a) after May 7, 1998 were and likely in the future will be or (b) will in the future be: subjected to nonroutine personal searches by United States Customs employees at any United States international airport and who were or will be detained for 24 hours or less."

(c) As to both class definitions: (i) class members are limited to those persons who are United States citizens or United States permanent residents; (ii) excluded from the class are any persons for whom the nonroutine personal search revealed the person possessed contraband materials; and (iii) "nonroutine personal searches" are defined as: (a) patdowns, strip searches, monitored urination and/or bowel movements, visual body cavity searches, and/or physical body cavity searches that have. and continue to occur in small enclosed rooms at O'Hare International Airport or in places used by United States Customs and its employees for similar purposes in other United States international airports; and (b) strip searches, monitored urination and/or bowel movements, visual and/or physical body cavity searches, x-rays, and/or the administration of laxatives to detained airline passengers that occur at the directions of United States Customs employees at non-border facilities, such as cooperating hospitals.

(5) Status hearing set for October 25, 2000 at 11:00 a.m.